THE HONORABLE MARSHA J. PECHMAN

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| HTC Corporation and HTC America, Inc.<br><br>Plaintiffs,<br><br>v.<br><br>Telefonaktiebolaget LM Ericsson and<br>Ericsson Inc.,<br><br>Defendants. | Case No.: 2:17-cv-00534-MJP<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1)  BREACH OF CONTRACT; and**<br>**(2)  BREACH OF THE IMPLIED**<br>**COVENANT OF GOOD FAITH &**<br>**FAIR DEALING**<br><br>JURY DEMAND |

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

## I. INTRODUCTION

1.       Plaintiffs HTC Corporation and HTC America, Inc. (collectively, "HTC") bring this action to compel Defendants Telefonaktiebolaget LM Ericsson and Ericsson Inc. (collectively, "Ericsson") to offer a license to their standard essential patents on Fair, Reasonable and Non-Discriminatory ("FRAND") terms, to stop Ericsson's illegal scheme to overcharge licensees, and to recover damages caused by Ericsson's unlawful licensing conduct.

2.       Ericsson has collaborated with its competitors and other companies to jointly develop the technical specifications that govern cellular interoperability.  These specifications are massive undertakings and reflect the contributions of hundreds of companies.[1]  The specifications are used by companies that design and build the tiny microprocessors embedded in cell phones.  These small chipsets, or baseband processors, provide the key functionality that enables different devices to connect with each other and to connect over diverse communication networks.

3.       Many of the companies that participate in this joint development work also own patents that are directed to their particular contributions.  Ericsson, for example, owns thousands of patents that cover Ericsson's contributions to the joint work product.  Ownership of these "standard essential patents" ("SEPs") gives the collaborating companies, such as Ericsson, the potential for enormous economic clout because companies in the cellular communication industry must practice the patented technology in order to have functioning products.

4.       These collaborative efforts have been closely scrutinized.  Competition authorities around the world have long recognized that a substantial risk exists that an

---

[1] For an example of one such specification, see *Specifications*, 3GPP, (last accessed Oct. 16, 2017), www.3gpp.org/specifications.

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT
(CASE NO. 2:17-CV-00534-MJP) –1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

unscrupulous participant could unfairly abuse the economic power stemming from the standards development process.  Therefore, to protect implementers and consumers from the possibility that participants like Ericsson might abuse their market power and demand unreasonable terms and rates, the competition authorities have embraced a licensing paradigm known as FRAND.  This licensing paradigm obligates participants in the standard setting process to make their essential patents available to anyone and everyone on terms that are **F**air, **R**easonable, **A**nd Non-**D**iscriminatory.

5.      To accommodate these antitrust concerns, the governing bodies for the various interoperability standards have also required participants to make contractual commitments to adhere to FRAND licensing.  Ericsson has agreed to these contractual undertakings. Thus, not only is Ericsson bound under basic principles of antitrust law to commit to FRAND licensing of its SEPs, Ericsson is also contractually bound to offer FRAND licenses.

6.      Among other things, the FRAND licensing paradigm prohibits the owner of a standard essential patent from seeking royalties based on contributions of others to the standard, unrelated innovation by companies that utilize the standard, or the increase in value that arises solely from adoption of the standard.

7.      Although the vast majority of participants act reasonably and fairly, Ericsson is a notorious exception.  After committing to license its SEPs on FRAND terms in order to have its technology embraced by its fellow collaborators, Ericsson has refused to adhere to this antitrust "safe harbor" or to honor its contractual obligations to offer licenses to its SEPs on FRAND terms.  Instead, Ericsson has used the power of its SEPs to demand unreasonable, unfair and discriminatory royalties from companies, like HTC, that have no choice but to purchase the chipsets that practice the joint specifications.  Among other things, Ericsson:

- Demands unreasonable and excessive royalties based on the price of the final device rather than the smallest saleable unit—the baseband processor—that

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

embodies the patented functionality;

- Demands discriminatory royalties by charging "downstream" parties like HTC exorbitant rates while providing a free pass to component suppliers that implement the same patented technology;

- Conceals its unlawful practices under a veil of secrecy by refusing to disclose license terms provided to other licensees;

- Facilitates its unlawful scheme by tying access to its SEPs and any proposed license terms to prospective licensees' agreement to non-public binding arbitration; and

- Refuses to recognize changing market realities, including the declining value and divestiture of its own patent portfolio.

8.     Ericsson's breach of its contractual obligations to offer its SEPs on a FRAND basis have resulted in harm to HTC.  HTC now faces loss of coverage from protection against patent infringement actions and exposure to a high risk of litigation in the United States and other jurisdictions.

9.     Accordingly, HTC brings this complaint for breach of contract and seeks declaratory relief in the form of:   (i) a judicial declaration that Ericsson's FRAND commitments constitute contractual obligations that are binding and enforceable by HTC; (ii) a judicial declaration that Ericsson has breached these obligations by demanding excessive and discriminatory royalties from HTC; (iii) a judicial decree enjoining Ericsson from further demanding excessive royalties from HTC that are not consistent with Ericsson's FRAND obligations; (iv) a judicial accounting and declaration of Ericsson's lawful FRAND royalty rate, and (v) damages for Ericsson's breach of contract.

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT
(CASE NO. 2:17-CV-00534-MJP) –3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

## II.  THE PARTIES

### A.    HTC

10.    Plaintiff HTC Corporation is a Taiwanese corporation with its principal place of business at 23 Xinghua Road, Tayouan 330, Taiwan, R.O.C.

11.    Plaintiff HTC America, Inc. ("HTC America") is a Washington corporation with its principal place of business at 308 Occidental Ave. S., Seattle, WA 98104.  HTC America is a wholly-owned American subsidiary of HTC Corporation that sells HTC's cellular and wireless devices in the United States.

12.    Founded in 1997, HTC is a pioneer in the smartphone market, credited with many industry firsts and technology breakthroughs over the past 19 years—a history defined by innovation, design and engineering excellence, and the building of strategic partnerships to facilitate the development of an industry ecosystem.  HTC has invested heavily in research and development, which accounts for about a third of its employees.

13.    HTC's growth accelerated dramatically in the early 2000s when it was selected to be Microsoft's first hardware platform development partner for the Windows Mobile operating system.  HTC similarly partnered with Google to build the first mobile phone running Google's Android mobile operating system, the Gl.  Through these efforts, and others, HTC was amongst the pivotal players that adopted and advanced 3G technology, including its introduction to, and widespread adoption by, consumers around the globe.

### B.    ERICSSON

14.    On information and belief, Defendant Telefonaktiebolaget LM Ericsson is a Swedish corporation with its principal place of business in Stockholm, Sweden.

15.    On information and belief, Defendant Ericsson Inc. is a Delaware corporation with its principal place of business in Plano, Texas and an office in Bellevue, Washington. Ericsson Inc. is a wholly-owned subsidiary of Telefonaktiebolaget LM Ericsson that develops, owns, and asserts standards-essential patents that are part of Ericsson's SEP portfolio.  Upon

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT
(CASE NO. 2:17-CV-00534-MJP) –4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

information and belief, Telefonaktiebolaget LM Ericsson has designated these patents standards-essential on behalf of itself as well as its subsidiaries, including Ericsson, Inc.

16.    On information and belief, Ericsson was founded in 1876 as a telegraph and telephone repair shop.  Ericsson has made and sold base stations and supporting software and services compliant with the Mobile Cellular Standards which are part of the cellular infrastructure throughout the United States, including Washington and this District.

17.    In addition to its widespread sales of network equipment and support services throughout the United States, Ericsson also aggressively monetizes its portfolio of intellectual property rights—including its patents declared essential to the Mobile Cellular and Wireless Standards—by enforcing its patents against or licensing to companies like HTC that sell mobile handsets to consumers in the United States.

18.    Upon information and belief, Ericsson has licensed its SEP portfolio specifically to and entered into licenses with, or for the benefit of, companies that are incorporated in or have a principal place of business in the State of Washington.

### III.  JURISDICTION AND VENUE

19.    This Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332 because this is an action between citizens of different states and because the value of declaratory and injunctive relief sought, the value of HTC's rights this action will protect and enforce, and the extent of the injury to be prevented exceed the amount of $75,000, exclusive of interest and costs.

20.    On information and belief, Defendants are subject to this Court's general personal jurisdiction, consistent with the principles of due process and the Washington Long Arm Statute, at least because Defendants maintain offices and facilities in the Western District of Washington, have employees in the Western District of Washington, offer products for sale in the Western District of Washington, and/or have transacted business in this District, including taking the position that Seattle-based HTC America, Inc. is infringing

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Ericsson's SEPs.  In addition to maintaining offices in Redmond, Washington, Defendants also have offices throughout the United States, including Arizona, California, Connecticut, Florida, Georgia, Illinois, Kansas, Maryland, Massachusetts, New Jersey, North Carolina, Ohio, Texas, and Virginia.  Accordingly, Defendants transact substantial business in this District and throughout the United States, and thus voluntarily avail themselves of the laws of the United States and Washington so as to be subject to the jurisdiction of this Court.

21.     Defendants are also subject to specific personal jurisdiction in Washington. Defendants own SEPs that must be practiced by implementers of the ETSI specifications, and have taken the position that products sold by HTC infringe those patents.  Defendants have taken this position knowing full well that HTC America has its principal place of business in Seattle, and that Seattle would be an appropriate venue for the resolution of these patent assertions.  *See TC Heartland LLC v. Kraft Food Grp. Brands LLC,* 137 S. Ct. 1514 (2017).

22.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a), 1391(c), and 1391(d).

## IV.  BACKGROUND

### A.     <u>Standards and their Economic Effects</u>

23.     The building blocks for the cell phone industry harken back to early days of the last century and the breakthrough invention of the radio.  The Nobel prize of 1909 recognized Guglielmo Marconi for his invention of "radio telegraphy."  Another leap forward took place in 1947, when Bell Labs scientists Shockley, Bardeen and Brattan invented the transistor. The multi-touch technology that is ubiquitous in smartphones today was invented in the 1970s.   The current smartphone revolution built on these and other groundbreaking inventions.

24.     Cell phone manufacturers today compete on the strength of numerous consumer focused innovations.  Advances in camera technology, video display, and audio technologies have further enhanced and driven smartphone sales.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

25.     Plaintiff HTC has been an historic leader in these cell phone innovations.  For example, one of its products, the recently-released HTC 10, has been widely praised for its "elegantly chiseled design, brilliant audio quality and [] highly customizable user interface."[2] HTC has invested millions in research and development to create consumer-centric innovations necessary to survive in a highly competitive market.

26.     In addition to competing on the strength of features and functionality, HTC's phones must be capable of operating in a network environment in which many different devices connect seamlessly with each other and with a diverse array of network equipment. The ability of devices manufactured by different companies to connect with each other is referred to as "interoperability."  Simply put, HTC cannot sell phones that lack the ability to interoperate.

27.     This interoperability in the cell phone industry does not result from breakthrough innovations or famous patented inventions.  Instead, interoperability results from a consensus-driven process whereby the industry participants get together and agree on the various rules and protocols necessary to make connections among devices.  These meetings do not involve the work of one, two or even a small handful of companies.  Instead, literally hundreds of companies meet privately to share information with an eye toward creating a single seamlessly connected communications environment.

28.     These interoperability meetings take place in the context of so-called Standard Setting Organizations (SSOs).  A prominent SSO for the cell phone industry is the European Telecommunication Standards Institute, or ETSI.  Over 900 companies, including Ericsson, are members and participants in the ETSI standards development work.  Ericsson has actively participated in ETSI and other SSO meetings, advocating for the creation of connection protocols that are compatible with Ericsson's products and services.  While Ericsson's

---

[2] *See HTC 10 Review*, CNET, (Apr. 14, 2016), https://www.cnet.com/products/htc-10-review/.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

engineers lobbied for the inclusion of particular rules and protocols, Ericsson's lawyers filed and obtained patents covering these same rules and protocols.

29.     The development and adoption of industry standards is a critical aspect of today's technology market.  For cellular networks to operate, cellular service providers, base station manufacturers, mobile wireless device manufacturers, and baseband processor chipset manufacturers must agree to follow a common set of standards which control how each part of a network communicates with other parts.  Thus, for decades, cellular service providers, chipset manufacturers and wireless device manufacturers have formed and distributed common standards for all members to follow.

30.     In its simplest terms, a standard provides rules or guidelines to achieve consensus and order in regards to a particular technology.   In the context of telecommunications technology, standards provide interconnection and interoperability so that devices can operate seamlessly and so that users, who increasingly use a variety of products from different manufacturers, can "mix and match" equipment, services, and providers.

31.     Standards are critical in creating a common technology platform because they allow different network components to be delivered by multiple vendors, promote interoperability of products and incentivize investments in infrastructure.  When operating as they are supposed to, standards increase competition, enhance innovation and product quality, and maximize consumer choice.

32.     But implementation of uniform standards requires certain tradeoffs.  For instance, a company implementing standards in a product must use certain mandated technology even where viable or superior alternatives exist.  Once a standard is adopted, participants begin to make investments tied to the implementation of the standard, such as creating compliant parts, building compliant cellular towers and even designing devices around particular capabilities.  Once a standard is adopted, switching technologies becomes

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

almost impossible because those products may no longer work with established networks. Accordingly, entire industries can become locked in to a standard.  When the standard is implemented at the level of the baseband processor, the device manufacturer may have no practical choice at all.

33.    Where standardized technologies are covered by standard essential patents, companies that choose to implement a standard are often required to practice those patents. Without safeguards, standard essential patent holders could demand inflated or discriminatory royalties, or threaten to block a company from implementing the standard. This abuse is called "patent hold up" and occurs "when the holder of a SEP demands excessive royalties after companies are locked into using a standard."  *Ericsson, Inc. v. D-Link Sys. Inc.*, 773 F.3d 1201, 1209 (Fed. Cir. 2014).  The instant action is not the first time that Ericsson has been accused of abusing its SEPs.

## B.    The FRAND Bargain

34.    To address the economic effects of standardization that would artificially inflate royalties for SEPs, SSOs require participants claiming to own SEPs to identify and disclose those patents publicly, and to promise to offer licenses for those patents to all implementers of the standard either royalty-free or on FRAND terms.  If a patent holder does not make this promise, SSOs generally design the standard without using the patented technology.

35.    FRAND royalties must start with the proper royalty base and a proper royalty rate, as required by the patent laws, but also must meet additional criteria designed to prevent misuse of the monopoly power conferred by adoption of a standard.  In particular, FRAND royalties must be limited by the actual technical contribution of the patented technology to the standard rather than the (i) "lock in" value that arises from standardization of technologies, i.e., the value gained simply because companies are forced to use the technology mandated in the standard; (ii) the value of all the technologies incorporated in an entire standard; or (iii)

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT
(CASE NO. 2:17-CV-00534-MJP) –9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

the competing value of the many technologies and many other standards that make up the actual device.

36.     In exchange for the power a SEP-holder receives by virtue of declaring its patents as essential to a standard, that SEP holder is bound by a FRAND obligation:  it promises to license its SEPs to anyone and thus relinquishes its right to exclude a willing licensee from the standards-based technologies.  Such an obligation is an important check on the patent holder's power to use SEPs to "hold up" implementers of the standard by refusing to license to competitors or by licensing to competitors only on discriminatory terms that undermine competition among the implementers of the standard.

37.     Because the FRAND obligation, at its core, seeks to level the playing field, and ensure that potential licensees have the greatest possible access to essential technology and information, FRAND obligations require that SEP-holders, like Ericsson, employ valuation techniques that take into account the actual value contributed by the patented technology at issue.  Offering discriminatory rates and demanding unreasonable royalties are clear violations of FRAND obligations.

C.     **Ericsson's Contractual FRAND Obligations to SSOs and Licensees**

38.     Ericsson is a member of ETSI, the 3rd Generation Partnership Project (3GPP) and the Institute of Electrical and Electronics Engineers (IEEE)—three SSOs.  ETSI is an independent, non-profit SSO that is responsible for the standardization of information and communication technologies, including mobile cellular technologies.  3GPP is a collaborative group of recognized SSOs in the information and communication industry, including ETSI.[3] The IEEE Standards Association ("IEEE-SA") is the standards-setting arm of the IEEE.  The IEEE-SA promulgates technical standards in a variety of fields, including wireless communications and telecommunications.

---

[3] ETSI and 3GPP have jointly worked together, and with others in the cellular industry, for years to develop broadly accepted standards for cellular technologies, including 2G, 3G, and 4G.

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT
(CASE NO. 2:17-CV-00534-MJP) –10

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

39.     To ensure that adopters are not captive to abusive and anticompetitive practices by patent holders, ETSI and the IEEE-SA—like other SSOs—require participants to commit to abide by their Intellectual Property Rights ("IPR") policies, which set forth the rights and obligations of their members.  For instance, pursuant to both ETSI and IEEE-SA IPR policies, members are to disclose standard essential and potentially standard essential patents and patent applications in a timely fashion.[4]

40.     In addition to public disclosure and declaration of any SEPs, ETSI's IPR Policy also requires that SEP owners submit a written commitment that they are prepared to grant irrevocable licenses to those SEPs on FRAND terms.  Specifically, Clause 6 of ETSI's IPR Policy states:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ('FRAND') terms and conditions . . . .

41.     If no FRAND commitment is made, the IPR Policy provides for ETSI to investigate alternative technology options for the standard to avoid the patent in question.[5]  In other words, ETSI will not agree to incorporate a member's technology in a standard under consideration unless the member irrevocably binds itself to granting licenses on FRAND terms.

42.     Clause 12 of the ETSI IPR Policy states that it "shall be governed by the laws of France," and the IPR Licensing Declaration contained within the ETSI Rules of Procedure

---

[4] *See ETSI Rules of Procedure*, Annex 6, Clause 4 (Apr. 5, 2017), *available at* http://www.etsi.org/images/files/IPR/etsi-ipr-policy.pdf.  The IEEE-SA has a virtually identical policy.  *See IEEE-SA Standards Board Bylaws*, Clause 6 (Dec. 2016), *available at* http://standards.ieee.org/develop/policies/bylaws/.

[5] *ETSI Rules of Procedure*, Annex 6, Clause 6.  The IEEE-SA similarly requires participants claiming to own relevant patents to grant licenses for those patents with any implementer of the standard on FRAND terms, or else it must disclaim enforcement of those patents against standards-compliant implementations..  *See IEEE-SA Standards Board Bylaws*, Clause 6.

states that "[t]he construction, validity and performance of this IPR information statement and licensing declaration shall be governed by the laws of France."

43.     Ericsson has declared numerous IPRs to ETSI, including United States patents and patent applications assigned to Ericsson.   More specifically, Telefonaktiebolaget LM Ericsson, along with its subsidiaries and affiliates, has declared to ETSI that a number of its patents and patent applications are or are likely to become essential to one or more of the Mobile Cellular Standards.   Consistent with, and pursuant to, ETSI's IPR Policies, Ericsson has submitted an IPR Information Statement and Licensing Declaration for each patent or patent application it believes to be standard-essential.

44.     In each such declaration, Ericsson promised to "grant irrevocable licenses under [its] IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR policy."   *See ETSI Rules of Procedure*, Annex 6 (IPR Information Statement and Licensing Declaration).   Ericsson has submitted at least 294 ETSI IPR Licensing Declaration forms through which it has declared a large number of its United States and foreign patents and patent applications essential to the standards for cellular communication.   Many of these patents and patent applications were assigned to and licensed by Telefonaktiebolaget LM Ericsson's wholly-owned licensing subsidiaries.   Ericsson made similar promises to other SSOs as well.[6]

45.     Ericsson is therefore contractually obligated to grant licenses on FRAND terms to the chipset manufacturers, as well as to HTC and other manufacturers of products that conform to ETSI standards.   Because HTC is a third party that wishes to use processors that implement the standard-compliant technology in the products it sells, HTC is a third-party beneficiary of the contracts between Ericsson and ETSI.   Specifically, Ericsson's commitment

---

[6] Similarly, Ericsson is a member of the IEEE and an alleged contributor to the wireless local area network ("WLAN") standard. Ericsson declared numerous IPRs to the IEEE-SA, including United States patents and patent applications assigned to Ericsson. In addition, upon information and belief, Ericsson has played a role in the WLAN standardization process.

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT
(CASE NO. 2:17-CV-00534-MJP) –12

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

to ETSI constitutes a stipulation on behalf of a third party, or *stipulation pour autrui*, pursuant to French law.  The doctrine of *stipulation pour autrui* derives from Article 1121 of the old French Civil Code, and is most recently codified in Article 1205 of the new French Civil Code.  Article 1205 explains:  "A person may make a stipulation for another person.  One of the parties to a contract (the 'stipulator') may require a promise from the other party (the 'promisor') to accomplish an act of performance for the benefit of a third party (the 'beneficiary').  The third party may be a future person but must be exactly identified or must be able to be determined at the time of the performance of the promise."  *Code civil* [C. civ.] art. 1205 (Fr.).

46.     This precisely describes Ericsson's FRAND obligation.  Here, the promisee is ETSI and the promisor is Ericsson.  Ericsson submitted IPR licensing declarations attesting to its willingness to "grant irrevocable licenses under this/these IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy," insofar as the identified IPRs remain essential to the relevant standard.  The third party beneficiaries of this commitment are the prospective licensees who benefit from the stipulation, which here includes HTC.  HTC is, therefore, a beneficiary of Ericsson's contractual obligations and promises to ETSI.  *See Unwired Planet Int'l Ltd. v. Huawei Techs. Co.* [2017] EWHC 711 (Pat) [806] (U.K.).

## D.     The Technology at Issue

47.     This dispute involves Ericsson's patents that Ericsson claims are essential to the technology standards underlying the world's cellular networks, including second generation (2G), third generation (3G), and fourth generation (4G) telecommunications standards, as well as WLAN standards.

48.     Baseband processing chipsets—a tiny component of the phones and devices manufactured by HTC—implement these jointly created standards.  Ericsson's SEPs at issue

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

in this lawsuit are directed to functionality largely performed by this tiny baseband processing chip.

49.     Ericsson's SEPs are not the only patents directed to features performed by the baseband processing chips in HTC's devices.  Over 900 companies belong to ETSI, and many of those companies have participated in the creation of the joint specifications. Consequently, Ericsson's SEPs are but a fraction of the total patents implicated in the baseband processor.  The entirety of the potentially applicable patented technology is often referred to as the "royalty stack."  Ericsson fails to account for this royalty stack when it makes its unreasonable licensing demands.

**E.      Ericsson Refuses to Offer Reasonable Royalty Rates**

50.     In its simplest terms, a reasonable rate must correspond to the value actually contributed by the SEP, cannot incorporate or reflect the value of other technology, and must also take into account market conditions which inevitably change over time.  The SEP-owner, moreover, bears the initial burden to put forth a license offer that satisfies the FRAND requirements.  Case C-170/13, *Huawei Techs. Co. v ZTE Corp.*, EU:C:2015:477, paragraph 63, [2015] Bus. L.R. 1261, available at http://curia.europa.eu/juris/document/document.jsf?docid=165911&doclang=en.

51.     Ericsson's rates are unreasonable because they ignore or flout three well-settled valuation methodologies that are required in order to calculate a FRAND rate: (i) use of the smallest saleable unit as the royalty base; (ii) factoring in apportionment; and (iii) accounting for the problem of royalty stacking.  As a matter of black-letter patent law regarding patent valuation, patent royalties are typically determined from a royalty base that begins with the smallest saleable unit that substantially embodies the patented functionality—and that base may need to be further apportioned to isolate the value of the patented invention.  Moreover, the royalty rate applied to that base must recognize other royalties levied by other patent holders on the royalty base in order to avoid the problem of an unduly high total "royalty

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

stack." The final royalty calculation must also account for end products that incorporate already-licensed components, such as chip components sold to HTC by a licensed manufacturer.

52.     *Ericsson Charges Exorbitant Royalties Based on the Value of the Finished Device*.  Ericsson has historically charged an exorbitantly high royalty that uses the entire market value of the finished device as the royalty base.  But setting the royalty base as a percentage of the average selling price ("ASP") of the phone ignores binding Supreme Court and Federal Circuit precedent that forbids basing a royalty on an entire device unless the patent at issue drives consumer demand for the whole device.  Instead, patent holders are required to base royalties, at most, on the smallest saleable patent-practicing unit. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) ("Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product.  Thus, it is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'"); *Golden Bridge Tech. v. Apple Inc.*, No. 5:12-cv-04882-PSG, 2014 WL 2194501, at *6 (N.D. Cal. May 18, 2014) ("'[I]n any case involving multi-component products, patentees may not calculate damages based on sales of the entire product, as opposed to the smallest saleable patent-practicing unit ['SSPPU'], without showing that the demand for the entire product is attributable to the patented feature.'") (quoting *LaserDynamics*, 694 F.3d at 67-68).

53.     Furthermore, "[w]here the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature . . ., the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014).  A royalty that fails to comply with these requirements violates FRAND obligations. *See In re Innovatio IP Ventures, LLC Patent Litig.*, No. 11 C 9308, 2013 WL 5593609, at

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

*13-14 (N.D. Ill. Oct. 3, 2013) (applying the smallest salable unit requirement to FRAND royalties); *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL 2111217, at *20 (W.D. Wash. Apr. 25, 2013) (A reasonable royalty must take into account not only the contribution of the patented technology to the standard, but the "contribution of those capabilities of the standard to the implementer and the implementer's products.").

54.     Here, the smallest salable unit where all or substantially all of the patented cellular standard-essential technology at issue is implemented or practiced is the baseband processor chipset.  Therefore, it is the chip—and not the end device (such as the phone or tablet)—that provides the appropriate royalty base for determining the value and corresponding royalties of Ericsson's SEPs.  *See GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1494247, at *13 (N.D. Cal. Apr. 16, 2014) (Where the asserted patents were claimed to be essential to 3G and 4G cellular standards, court held "as a matter of law" that "the baseband processor is the proper smallest saleable patent-practicing unit.").  Ericsson's refusal to use the chip as the royalty base in order to determine a reasonable royalty rate is a clear violation not only of applicable law but also of its FRAND obligation.

55.     *Ericsson Refuses to Factor in Apportionment.*  Ericsson also ignores Federal Circuit precedent that requires SEP-holders to apportion the patented features of the smallest salable unit from the unpatented ones as well as the value derived by the standard's adoption of the patented technology.  *Ericsson*, 773 F.3d at 1232 ("When dealing with SEPs, there are two special apportionment issues that arise.  First, the patented feature must be apportioned from all of the unpatented features reflected in the standard.  Second, the patentee's royalty must be premised on the value of the patented feature, not any value added by the standard's adoption of the patented technology."); *VirnetX*, 767 F.3d at 1327 ("[T]he requirement that a patentee identify damages associated with the smallest salable patent-practicing unit is simply a step toward meeting the requirement of apportionment. . . . [T]he patentee must do more to estimate what portion of the value of that product is attributable to the patented technology.");

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

*see also Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.* ("CSIRO"), 809 F.3d 1295, 1305 (Fed. Cir. 2015), cert. denied, 136 S. Ct. 2530 (2016) ("[R]easonable royalties for SEPs generally . . . must not include any value flowing to the patent from the standard's adoption.").

56.     Ericsson has not even attempted this required apportionment, and thus has failed to specify the value attributable to the patented technology, separate and apart from the other value attributable to, among other things, (i) non-patented features, (ii) standardization itself, and (iii) unrelated technology.  Because Ericsson's rates do not factor in apportionment, as required when calculating a reasonable royalty rate, these rates do not comply with Ericsson's FRAND obligations.

57.     *Ericsson Does Not Account for Royalty Stacking.*  Ericsson's licensing rate does not account for "royalty stacking"—the "payment of excessive royalties to many different holders of SEPs."  *See Microsoft*, 2013 WL 2111217, at *11.  Applicable case law requires that "a reasonable royalty rate [be] . . . based on the principles underlying the RAND commitment, one of which is the concern of royalty stacking." *Id.* at *74.  Ericsson's rates do not account for its pro rata share of the applicable patents, compared to the total, industry-wide pool of such SEPs.  Indeed, Ericsson purposefully withholds this information from licensees so that it can continue to overcharge for its SEPs.

## F.     <u>Ericsson Demands Discriminatory Rates</u>

58.     Ericsson also insists on *discriminatory* rates.  A non-discriminatory rate means that Ericsson cannot exploit some licensees—such as HTC—by demanding rates that are a multiple of the rates offered to other licensees.  Upon information and belief, Ericsson charges other implementers—such as the chip manufacturers—little or no fees while demanding unreasonable fees from HTC.

59.     Ericsson also unfairly exploits its superior information concerning the license rates paid by other companies.  Ericsson has perfect information concerning the license rates

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

paid by others.   Potential licensees, however, have little or no information concerning "comparable sales."   Ericsson ensures its ability to engage in discriminatory pricing by conducting licensing negotiations in secret, taking advantage of this asymmetry of information.   Ericsson requires that potential licensees enter into adhesive non-disclosure agreements for all negotiations and licenses.   As a consequence, only Ericsson knows the terms and rates paid by other licensees.   Armed with this one-sided knowledge, Ericsson then leverages this asymmetry of information in order to extract discriminatory terms from its licensees.

60.   Information about the validity, scope and value of SEPs is critical to the functioning of the standard setting process, and in particular, to the FRAND commitments at the heart of that process.   Without this information, licensees cannot know the value of patents they must license to practice the standards or what constitutes a fair, reasonable and nondiscriminatory rate for those patents.   But it is this very information that Ericsson hides and obfuscates so that it can charge exorbitant and discriminatory rates to different licensees.

61.   Ericsson takes this asymmetry of information a step further.   Not only does it shroud its licensing negotiations and terms in secrecy, it also ensures that licensees cannot discover the value of Ericsson's SEPs through litigation because it forces potential licensees to sign mandatory, non-public arbitration clauses.   This facilitates Ericsson's ability to continue its licensing scheme and makes it more difficult for licensees to challenge those practices and obtain relief from Ericsson's wrongful conduct.

**G.**      **Ericsson Refuses to Acknowledge Changing Market Realities**

62.   Ericsson's licensing practices also run afoul of Ericsson's FRAND obligations because Ericsson fails to recognize or account for changing market realities or the declining value of Ericsson's patent portfolio when calculating royalty rates.   Many of Ericsson's patents are directed to legacy technologies.   Likewise, the product features driving pricing and consumer demand now have nothing to do with older generation technical specifications.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Ericsson did not invent camera functionality, storage capacity, touch screen capability, user interface innovations, mobile operating systems, video display technology, or the multitude of popular cell phone applications.

63.     Further, Ericsson's SEPs have begun to expire at a rapid rate, and the portfolio will dramatically reduce in coming years as many SEPs continue to expire.  On information and belief, at least one-third of Ericsson's 2G, 3G, and 4G SEPs will expire between 2017 and 2020.  Meanwhile, the rate of new patents issued to Ericsson has declined dramatically. At a minimum, Ericsson's expiring patents and declining invention rates should be taken into account for any new royalty rate.

64.     Not only have Ericsson patents expired, but Ericsson has gradually divested itself of its portfolio.  On information and belief, in 2011, Ericsson sold 2,000 wireless patents to MOSAID Technologies Inc. (now known as Conversant Intellectual Property Management Inc.) and its subsidiary Core Wireless Licensing, S.a.r.l., including about 1,215 essential patents.

65.     On information and belief, in 2012, Ericsson sold 450 wireless and video patents and patent applications to Sisvel International, an Italian patent licensing company, including some 350 patents that were declared essential to standards for GSM, 3G, and 4G/LTE.

66.     On information and belief, in 2012, Ericsson sold to Vringo, Inc. ("Vringo") more than 500 patents that, according to Vringo, "encompasses a broad range of technologies relating to cellular infrastructure, including communication management, data and signal transmission, mobility management, radio resources management and services."  Thirty one of the 124 patent families acquired by Vringo have been declared essential by Ericsson to wireless communications standards."

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT
(CASE NO. 2:17-CV-00534-MJP) –19

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

67.     On information and belief, in 2012, Acacia Research Corporation, through a subsidiary, acquired patents for wireless infrastructure and user equipment technology from Ericsson Siemens Networks relating to 2G, 3G, and 4G wireless technologies.

68.     In addition to these examples, Ericsson has likely entered additional transactions in which it sold or otherwise divested itself of additional SEPs that must be considered in assessing a reasonable royalty for its remaining portfolios.

69.     Notwithstanding this incredible shrinkage of its intellectual property rights, Ericsson refuses to lower its demands.

## H.     Ericsson's Breach of its Obligation to License its SEPs on FRAND Terms

70.     HTC has repeatedly made clear its willingness and intention to enter a license agreement with Ericsson, and to pay license fees that are fair and reasonable.   Ericsson, however, must come forward and offer a FRAND license.  *Huawei Techs. Co. v ZTE Corp.*, paragraph 63.

71.     But with willful disregard of the commitments it made to ETSI, 3GPP, and the IEEE, Ericsson has refused to offer HTC a FRAND rate to license Ericsson's SEP portfolio. Ericsson has threatened patent litigation against HTC since at least 2003, and these threats, express or implied, continue to this day.  Indeed, by threatening HTC, Ericsson is exploiting the significant economic power it gained as a result of the inclusion of its technology into the Mobile Cellular and Wireless Standards.   By refusing to provide a reasonable and non-discriminatory offer, Ericsson is effectively insisting that HTC "bid against itself."   In the context of FRAND licensing, this behavior is the opposite of "good faith" violates French law.

72.     Because of Ericsson's refusal to honor its contractual obligations and offer licenses to its SEPs on FRAND terms, HTC now faces exposure to a high risk of litigation in the United States and other jurisdictions.

73.     Additionally, Ericsson's threats of patent litigation, and the understandable fear by HTC that such litigation could literally destroy its business, has caused HTC to pay

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT
(CASE NO. 2:17-CV-00534-MJP) –20

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

substantial royalties to Ericsson.  To prevent Ericsson from using its economic clout to shut down its business, HTC has made quarterly royalty payments of millions of dollars to Ericsson.  These royalty payments have been made each quarter for well over a decade. These payments were improperly and unlawfully extracted by Ericsson in breach of its FRAND licensing obligations.

## V.  CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Breach of Contract)

74.     HTC realleges and incorporates by reference the allegations set forth in all of the preceding paragraphs, as though fully set forth herein.

75.     Ericsson entered into contractual commitments to offer fair, reasonable and non-discriminatory licenses to its SEPs with ETSI, 3GPP, the IEEE and their respective members, participants, and implementers relating to the Mobile Cellular and Wireless Standards.

76.     Each third party that would potentially implement the Mobile Cellular and Wireless Standards was an intended beneficiary of a *stipulation pour autrui*.

77.     HTC is an intended beneficiary of those contracts.

78.     Ericsson was obligated to offer a license to its SEPs consistent with the applicable IPR policy of ETSI and 3GPP, including that such a license be on FRAND terms.

79.     Ericsson was further contractually obligated to offer a license to its SEPs consistent with the applicable IPR policy of the IEEE-SA, including that such a license be on FRAND terms.

80.     Ericsson has refused to offer a FRAND rate.  Instead, it has insisted on rates that are unreasonable, unfair and discriminatory.

81.     Ericsson demands royalties that are *unreasonable*.  Historically Ericsson has based its demands on the value of entire devices, such as smartphones.  The law requires,

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

however, that royalties be set using as the royalty base (at most) the smallest saleable unit that substantially embodies the patented technology, to which a reasonable royalty rate is then applied.  For these patents, that royalty base would be (at most) the baseband processor chip that performs telecommunications processing functions.  The law also requires that the royalties be set to reflect the value of the patented technology alone.  For Ericsson's SEPs, that would acknowledge the decline in the significance of the technology, including that this technology has declining impact on consumer demand.

82.     Ericsson demands royalties that are *unfair*.  It continues to demand royalty payments from HTC for patents that it no longer owns.  By basing its demands on historical rates that do not reflect either patent expirations or patent divestitures, Ericsson is violating its contractual obligation to make its SEPs available on fair terms.

83.     As a result of Ericsson's contractual breaches, HTC has been injured in its business or property, and is threatened by a gap in coverage from patent infringement protection and thus an imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

84.     As a result of Ericsson's contractual breaches, HTC has also incurred substantial monetary damage by being forced to pay non-FRAND royalties to Ericsson over the course of the parties' long relationship.  Recovery of damages for breach of a FRAND obligation may include back royalties paid as a result.  *See Unwired Planet Int'l Ltd. v. Huawei Techs. Co.* [2017] EWHC 711 (Pat) [796] (U.K.).

85.     HTC has suffered and will continue to suffer irreparable injury by reason of the acts, practices, and conduct of Ericsson alleged above until and unless the Court enjoins such acts, practices, and conduct.

## SECOND CAUSE OF ACTION

### (Implied Covenant of Good Faith and Fair Dealing)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

86.     HTC realleges and incorporates by reference the allegations set forth in all of the preceding paragraphs, as though fully set forth herein.

87.     The FRAND commitment requires good faith behavior.  Paragraph 3 of the old French Civil Code dictates that contracts "must be performed in good faith."

88.     ETSI has internalized this requirement of good faith, instructing in its "Guide on IPRs" that license negotiations be conducted "bilaterally in a friendly manner."  *ETSI Guide on Intellectual Property Rights (IPRs)*, at Foreward, (Version #94 Sept. 19, 2013), http://www.etsi.org/images/files/IPR/etsi-guide-on-ipr.pdf.

89.     Ericsson has acted in bad faith by refusing to offer a license to Ericsson's patents essential to the Mobile Cellular and Wireless Standards on FRAND terms.

90.     Ericsson has, accordingly, wrongfully and intentionally breached the covenant of good faith and fair dealing by denying HTC the benefits to which they are entitled under Ericsson's FRAND obligations.

## VI.  PRAYER FOR RELIEF

WHEREFORE, HTC prays for declaratory relief as follows:

A.     Adjudge and decree that Ericsson is liable for breach of contract;

B.     Declare that Ericsson has not offered royalties to HTC under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination;

C.     Enjoin Ericsson from further demanding excessive royalties from HTC that are not consistent with Ericsson's FRAND obligations;

D.     Declare that HTC is entitled to license from Ericsson any and all patents that Ericsson deems "essential" and/or has declared "essential" to the Mobile Cellular and Wireless Standards under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination;

E.     Determine and declare the FRAND rates that HTC is entitled to for each of the Mobile Cellular and Wireless Standards;

F.      Enter judgment awarding HTC a license from Ericsson to any and all patents that Ericsson deems "essential" and/or has declared "essential" to the Mobile Cellular and Wireless Standards under the Court's determined FRAND rate, with reasonable terms and conditions that are demonstrably free of any unfair discrimination;

G.      Enter judgment against Ericsson for the amount of damages that HTC proves at trial, including back royalties HTC has been forced to pay to Ericsson, and, as appropriate, exemplary damages;

H.      Enter a judgment awarding HTC its expenses, costs, and attorneys' fees under applicable laws;

I.      Award HTC pre-judgment and post-judgment interest to the full extent allowed under the law, as well as its costs; and

J.      For such other and further relief as the Court deems just and proper.

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT
(CASE NO. 2:17-CV-00534-MJP) –24

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

DATED:  October 16, 2017.

By:  s/ Andrew Culbert
David J. Burman, #10611
Andrew Culbert #35925
Susan Foster #18030
Cori G. Moore, #28649
Elvira Castillo, #43893
Laura K. Hennessey, #47447
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Tel:  206.359.8000/Fax:  206.359.9000
Email:  DBurman@perkinscoie.com
Email:  ACulbert@perkinscoie.com
Email:  SFoster@perkinscoie.com
Email:  ECastillo@perkinscoie.com
Email:  CGMoore@perkinscoie.com
Email:  LHennessey@perkinscoie.com


By:  s/ James C. Yoon
Gregory Lewis Watts, #43995
Albert Shih, *Admitted Pro Hac Vice*
Dale R. Bish, *Admitted Pro Hac Vice*
James C. Yoon, *Admitted Pro Hac Vice*
Jamie J. Yoo, *Admitted Pro Hac Vice*
Nellie J. Amjadi, *Admitted Pro Hac Vice*
Olivia M. Kim, *Admitted Pro Hac Vice*
**Wilson Sonsini Goodrich & Rosati**
701 5th Ave Ste 5100
Seattle, WA  98104-7036
Tel:  206.883.2617/Fax:  206.883.2699
Email:  gwatts@wsgr.com
Email:  ashih@wsgr.com
Email:  dbish@wsgr.com
Email:  jyoon@wsgr.com
Email:  jyoo@wsgr.com
Email:  namjadi@wsgr.com
Email:  okim@wsgr.com

*Attorneys for Plaintiffs HTC Corporation*
*and HTC America, Inc.*

FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT
(CASE NO. 2:17-CV-00534-MJP) –25

**CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2017, I caused copies of the foregoing document to

be served via CM/ECF to the following counsel of record:

Philip S. McCune, WSBA #21081
Steven O. Fortney, WSBA #44704
SUMMIT LAW GROUP PLLC
315 Fifth Avenue S., Suite 1000
Tel: (206) 676-7000
Email: philm@summitlaw.com
Email: stevef@summitlaw.com

Laurie Fitzgerald *(admitted pro hac vice)*
Steven J. Pollinger, WSBA # 23075
McKOOL SMITH P.C.
300 W. 6th Street, Suite 1700
Austin, TX 78701
Tel: (512) 692-8700
Email: lfitzgerald@mckoolsmith.com
Email: spollinger@mckoolsmith.com

Theodore Stevenson, III *(admitted pro hac vice)*
McKOOL SMITH P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
Tel: (214) 978-4974
Email: tstevenson@mckoolsmith.com

*/s/Andrew Culbert*
Andrew Culbert

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000