# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | | |
|---|---|---|
| HTC CORPORATION, HTC AMERICA INC, | § § § § § § § § § § § § § | |
| *Plaintiffs*, | | CIVIL ACTION NO. 6:18-CV-00243-JRG |
| v. | | |
| TELEFONAKTIEBOLAGET LM ERICSSON, ERICSSON INC, | | |
| *Defendants*. | | |

## MEMORANDUM OPINION AND ORDER

### I. THE DISPUTE[1]

Defendants Telefonaktiebolaget LM Ericsson and Ericsson, Inc. (collectively "Ericsson") own patents that are essential to the 2G, 3G, 4G, and WLAN standards ("Standard Essential Patents" or "SEPs"). (Dkt. No. 156 ¶ 51 (Answer).) Ericsson has made a commitment to the European Telecommunications Standards Institute ("ETSI") to license its SEPs on terms that are fair, reasonable, and non-discriminatory ("FRAND") to companies that practice the standards. (*Id.* ¶ 110.) This commitment is embodied in ETSI's Intellectual Property Rights ("IPR") policy and forms a contract between Ericsson and ETSI, in which standards-implementers are third-party beneficiaries. *ETSI Rules of Procedure*, Annex 6, Clause 6.1; Taffet, Richard & Harris, Phil, *Standards and Intellectual Property Rights policies*, in PATENTS AND STANDARDS PRACTICE, POLICY, AND ENFORCEMENT at 4–10 (Michael L. Drapkin et al. eds., *Bloomberg Law* Book

---

[1] For a more detailed discussion on the procedural history of this case, the parties' dispute, Standard Essential Patents, and the FRAND commitment, see the Court's previous orders at Dkt. Nos. 220 and 316.

1

Division, 2018).  The ETSI IPR policy expressly provides that such contract is governed by French law.  *ETSI Rules of Procedure*, Annex 6, Clause 12.

Plaintiffs HTC Corporation and HTC America, Inc. (collectively "HTC") design, manufacture, and sell smartphones that implement Ericsson's SEPs and are thus third-party beneficiaries to the contract between Ericsson and ETSI.  (Dkt. No. 135 ¶¶ 48–50.)  According to Ericsson, "HTC claims that the FRAND assurance required Ericsson to [] offer licenses based on estimated profit on the smallest salable patent-practicing unit (SSPPU) in the phones."  (Dkt. No. 210 at 1.)  Pursuant to Federal Rule of Civil Procedure 44.1, Ericsson moves for a ruling that as a matter of French law, the FRAND commitment does not require an owner of SEPs to offer a license using a royalty based on the SSPPU (the "Motion").  (*Id.* at 15.)  Having considered the briefing, the parties' expert declarations, and other relevant sources, the Court hereby **GRANTS** Ericsson's Motion to the extent and for the reasons set forth herein.

## II. LEGAL STANDARDS

### a. Federal Rule of Civil Procedure 44.1

Federal Rule of Civil Procedure 44.1 allows a party to move for a determination of foreign law. In making this determination, "the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  FED. R. CIV. P. 44.1.  The court, therefore, "may engage in its own research and consider any relevant material thus found," regardless of its admissibility.  FED. R. CIV. P. 44.1 advisory committee's note to 1996 amendment.  The court's determination "must be treated as a ruling on a question of law," and not fact.  FED. R. CIV. P. 44.1; FED. R. CIV. P. 44.1 advisory committee's note to 1996 amendment (noting that this provision was included "so that appellate review will not be narrowly confined by the 'clearly erroneous' standard of Rule 52(a)); *see also*

*Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of Republic of Venezuela*, 575 F.3d 491, 498 n.8 (5th Cir. 2009) ("[T]he content of foreign law is a question of law") (internal citation omitted); *Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 700 (S.D.N.Y. 2003) ("To the extent that these submissions are helpful to the Court in understanding the Russian legal system, the Court may use the declarations to answer questions of law. The Court will not use the declarations to make determinations of fact because this is not proper under Rule 44.1.").

### b. French Contract Law

The French Civil Code is the main source of French contract law. The code was substantially revised in 2016 to provide a more comprehensive and predictable framework. Rowan, Solene, *The New French Law of Contract*, INT'L & COMP. L. Q. 6 (2017), http://eprints.lse.ac.uk/75815/1/Rowan_New%20French%20law_2017.pdf. In particular, the 2016 amendments "codified principles previously developed in the French case law" and restructured the order of the articles to "correspond[] to the life cycle of a contract." *Id.*

Article 1101 provides that "[a] contract is a concordance of wills of two or more persons intended to create, modify, transfer or extinguish obligations." CODE CIVIL [C. CIV.] art. 1101 (Fr.) (2016). To determine a party's contractual obligations, the court must first look at the express terms of the contract. (Dkt. No. 235–3 at 16.) "[J]udges are under a strict duty to enforce 'clear and precise' terms." DUNCAN FAIRGRIEVE, COMPARATIVE LAW IN PRACTICE: CONTRACT LAW IN A MID-CHANNEL JURISDICTION 125 (Hart Publishing 2016) [*hereinafter* COMPARATIVE LAW IN PRACTICE]; C. CIV. art. 1192 ("Clear and unambiguous terms are not subject to interpretation as doing so risks their distortion."). Only when the terms are ambiguous may the court engage in contractual interpretation. COMPARATIVE LAW IN PRACTICE, at 125–26 ("If an ambiguity is found to be present in the contract, then the issue will become an 'interpretative' one, and may thus lead

to a judicial interpretation of the contract."); (Dkt. No. 235–3 at 16.) Such interpretation requires giving terms "the meaning that best reflects the common intent of the parties" "at the time they contracted." COMPARATIVE LAW IN PRACTICE, at 125–26; *see also* C. CIV. art. 1188, par. 1 ("A contract is to be interpreted according to the common intention of the parties rather than stopping at the literal meaning of its terms.") If the "parties' common intention cannot be discerned, a contract is to be interpreted in the sense which a reasonable person placed in the same situation would give to it." C. CIV. art. 1188, par. 2.

In addition to a contract's express terms, a party's obligations may also be implied "by equity, usage, or legislation." C. CIV. art. 1194; *see also* COMPARATIVE LAW IN PRACTICE at 128; Filip De Ly, *Les Clauses D'Interpretation Dans Les Contrats Internationaux (Qualification, Definition, Accord Complet, Intitules, Langue, Modification, Renonciation et Nullite Partillel)* 2000 Int'l Bus. L.J. 719, 724 (2000). That is, French law may imply certain terms into the contract based on fairness to the parties, customary practices in a particular field, or legislation. (Dkt. No. 210–2 at 8–10.)

The following provisions in the French Civil Code guide the Court's application of the above general principles:

> Article 1189. – All terms of a contract are to be interpreted in relation to each other, giving to each the meaning which respects the consistency of the contract as a whole.
>
> Where, according to the common intention of the parties, several contracts contribute to one, and the same operation, they are to be interpreted by reference to this operation.
>
> Article 1190. – In case of ambiguity, a bespoke contract is interpreted against the creditor and in favour of the debtor, and a standard-form contract is interpreted against the person who put it forward.
>
> Article 1191. – Where a contract term is capable of bearing two meanings, the one which gives it some effect is to be preferred to the one which makes it produce no effect.

4

## III. DISCUSSION

Ericsson's Motion asks the Court to determine whether the FRAND commitment requires a royalty to be based on the SSPPU. The FRAND commitment is set forth in the ETSI IPR policy, is "governed by the laws of France," and is "solely [] contractual [in] nature." *ETSI Rules of Procedure*, Annex 6, Clauses 6.1, 12.

As an initial matter, the Court notes that Ericsson's Motion raises a question of French contract interpretation, which is a question of law and thus appropriate for resolution under Rule 44.1. *See Bodum USA, Inc. v. La Cafetiere, Inc.*, 621 F.3d 624, 631 (7th Cir. 2010) (interpreting stock purchase agreement governed by French law pursuant to Rule 44.1 and rejecting argument that "French preference for intent over text means that interpretation must be a question of fact" given that ascertaining intent "is done by objective means"); *RCTV Int'l Corp. v. Rosenfeld*, No. 13-23611, 2016 WL 6818955, at *4 (S.D. Fla. Sept. 30, 2016) (interpreting scope and duration of assignment of copyright under Venezuelan law under Rule 44.1); *Bayer CropScience AG v. Dow Agro Sciences, LLC*, No. 12–256, 2013 WL 5539410, at *4 n.4 (D. Del. Oct. 7, 2013) (interpreting agreement under English law under Rule 44.1); *see generally* COMPARATIVE LAW IN PRACTICE, at 42 (noting that while French law looks to the parties' common intentions, which is premised on factual inquiries, "the existence of mutual consent is assessed from an objective standpoint").

HTC urges the Court to rule otherwise and argues that "Ericsson is [] asking the Court not only to determine what French law is, but also to make findings of fact, to apply French law to those facts, and to then reach ultimate conclusions on the merits of the parties' positions in the case." (Dkt. No. 235 at 2.) HTC points to a previous case in which Ericsson allegedly made a similar motion under Rule 44.1 which was rejected as raising factual issues. (*Id.* (citing *TCL Communications Technology Holdings, Ltd. v. Telefonaktenbologet LM Ericsson*, No. 14-00341,

2016 WL 7049389 (C.D. Cal. July 25, 2016).) However, that case is distinguishable from the present case, and resulting ruling is not precedentially binding on this Court. As stated above, the present inquiry is one of contract interpretation, which has always been treated as a question of law.[2]

Having confirmed the propriety of Ericsson's Motion, the Court now turns to the merits of the issue. To determine whether the FRAND commitment requires the royalty to be based on the SSPPU, French contract law requires the Court to first look at the express language of the contract. Clause 6.1 of the ETSI IPR policy provides:

**6      Availability of Licenses**

6.1    When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ("FRAND") terms and conditions under such IPR to at least the following extent:

> - MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;
> - sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;
> - repair, use, or operate EQUIPMENT; and
> - use METHODS.

The above undertaking may be made subject to the condition that those who seek licenses agree to reciprocate.

---

[2] HTC also argues that even if Ericsson's Motion is appropriate under Rule 44.1, the Court should not rely solely on the expert declarations submitted by the parties and should instead "conduct[] [its own] independent research and then h[o]ld an evidentiary hearing." (Dkt. No. 235 at 3.) HTC further argues that reliance on Ericsson's expert, Dr. Borghetti, is improper because he "determine[s] how [the FRAND] contract should be interpreted based on his understanding of the facts of the case." (*Id.* at 4.) HTC proffers that "experts 'may not provide legal conclusions' as to how a contract should be interpreted." (*Id.* at 4–5 (internal citations omitted).) Rule 44.1, however, expressly permits the Court to rely on materials that would otherwise be inadmissible. FED. R. CIV. P. 44.1. HTC's objections therefore do not preclude resolution of the present Motion.

*ETSI Rules of Procedure*, Annex 6, Clause 6.1. As relevant here, MANUFACTURE is defined as the "production of EQUIPMENT" and EQUIPMENT is defined as "any system, or device fully conforming to a STANDARD." *Id.* at Clauses 15.4, 15.8. Substituting the definitions of MANUFACTURE and EQUIPMENT into Clause 6.1, the provision reads:

> **6     Availability of Licenses**
>
> 6.1    When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ("FRAND") terms and conditions under such IPR to at least the following extent:
>
>> - produce any system, or device fully conforming to a STANDARD, including the right to make or have made customized components and sub-systems to the licensee's own design for use in the production of any system, or device fully conforming to a STANDARD;
>> - sell, lease, or otherwise dispose of any system, or device fully conforming to a STANDARD so produced;
>> - repair, use, or operate any system, or device fully conforming to a STANDARD; and
>> - use METHODS.
>
> The above undertaking may be made subject to the condition that those who seek licenses agree to reciprocate.

Examining Clause 6.1 further, this means that if a member informs ETSI of an ESSENTIAL IPR relating to a particular STANDARD, the Director-General of ETSI must ask the IPR holder to make a commitment to grant companies a license to conduct "at least" the following activities:

> (1) a license to produce any system, or device fully conforming to a STANDARD, including the right to make or have made customized components and sub-systems to the licensee's own design for use in the production of any system, or device fully conforming to a STANDARD;

7

(2) a license to sell, lease, or otherwise dispose of any system, or device fully conforming to a STANDARD so produced;

(3) a license to repair, use, or operate any system, or device fully conforming to a STANDARD; and

(4) a license to use METHODS.

The "terms and conditions" of each of these licenses must be "fair, reasonable, and non-discriminatory."

All "clear and unambiguous" terms are to be strictly enforced. C. CIV. art. 1192. According to the express language of Clause 6.1, the scope of the license must include "at least" the right "to produce any system, or device fully conforming to a STANDARD, including the right to make or have made customized components and sub-systems . . . for use in the production of any system, or device fully conforming to a STANDARD." The use of the terms "at least" and "including" place important parameters on the scope of the license. Merriam-Webster's Dictionary and Oxford's Dictionary define "at least" to mean "at the minimum." *See least*, MERRIAM-WEBSTER ONLINE DICTIONARY, *available at* http://www.merriam-websters.com (last visited Jan. 7, 2019); *least*, ENGLISH OXFORD ONLINE DICTIONARY, *available at* https://en.oxforddictionaries.com/ (last visited Jan. 7, 2019). "Including" is defined in Oxford's Dictionary as "containing as part of the whole being considered" and in Merriam-Webster's Dictionary as "to take in or comprise as a part of a whole or group." *See including*, MERRIAM-WEBSTER ONLINE DICTIONARY, *available at* http://www.merriam-websters.com (last visited Jan. 7, 2019); *including*, ENGLISH OXFORD ONLINE DICTIONARY, *available at* https://en.oxforddictionaries.com/ (last visited Jan. 7, 2019). Applying those definitions to the text, Clause 6.1 simply states that *at a minimum* an SEP-holder must offer companies the right to

not only make any systems or devices that conform to a standard, but also the right to make any components or sub-systems used to make such systems or devices. Critically, there is nothing in the text that says *if or when* an SEP-holder must offer a license to make a system or device versus the right to make the components or sub-systems thereof.

At most, Clause 6.1 states that each license, whether for the device or a component thereof, must be on "terms and conditions" that are "fair, reasonable, and non-discriminatory." However, as both parties' experts concede, the ETSI IPR policy says nothing about what it means for a license to be FRAND. (*See* Dkt. No. 210–2 ¶ 7 ("The ETSI IPR Policy states that IPR holders should be ready to grant licenses on FRAND terms, but it does not say how a FRAND rate should be calculated. In particular, it gives no explicit indication as to what the basis should be for the royalty paid by the licensee.") (Declaration of Jean-Sebastien Borghetti on behalf of Ericsson)); (Dkt. No. 235–3 ¶ 13 ("ETSI's IPR Policy does not provide a definition of FRAND, and so the term has been subject to interpretation.") (Declaration of Philippe Stoffel-Munck on behalf of HTC).) In the absence of such a definition, the Court finds that the terms "fair, reasonable, and non-discriminatory" are not "clear and unambiguous" and must therefore be construed according to the parties' common intentions. C. CIV. art. 1188, par. 1. If that is not possible, then the Court must interpret the terms according to how a reasonable person in the same situation would understand them. C. CIV. art. 1188, par. 2.

In support of its Motion, Ericsson offers expert testimony from Dr. Bertram Huber. Dr. Huber was a member of the ETSI IPR Committee from its first meeting in 1989 to the adoption of the ETSI IPR policy in 1994. (Dkt. No. 210–4 ¶¶ 10–11.) During that time, he "was actively involved in discussions of the general outline of ETSI's framework for IPR, as well as drafting the clauses and stipulations of the ETSI IPR Policy." (*Id.* ¶¶ 22–23.) In his declaration, Dr. Huber

9

explains that at the time the ETSI IPR policy was adopted, the general industry practice was to offer licenses based on the price of the end-user device, and not on the component-level. (*Id.* ¶¶ 25, 27, 36–39.) He explains that this "prevailing industry practice in 1994 (which remains in place today) is reflected in the language of the ETSI IPR Policy, and the ETSI IPR Policy was understood not to upset that practice." (*Id.* ¶ 27.) In particular, he states that "licensing chip suppliers or using a component such as the chipset as a basis of reference for calculating FRAND royalties are not in line with industry practice in the mobile telecommunications industry" and that such a practice is not "contemplated, [] much less even mandated, by the ETSI IPR Policy or any other provision of the ETSI Directives." (*Id.* ¶ 39.)

HTC's expert, Dr. Philippe Stoffel-Munck, disagrees. According to Dr. Stoffel-Munck, "it is generally difficult to establish a genuine 'common intention'" of an association, such as ETSI. (Dkt. No. 235–3 ¶ 17.) The ETSI IPR policy was adopted by a majority, and not unanimous, vote, and thus does not necessarily reflect a "common intent" shared by all of its members. (*Id.*) As such, he explains that a French court would interpret the FRAND commitment "based on what a reasonable person would understand in the context of the declaration at the time it was signed by the patent holder." (*Id.* ¶ 19.) In his opinion, this would entail "an objective approach that focuses on how the contract can flourish in the present time that is reasonable and fits with the needs of the contract" and "in a way that would be compatible with EU competition law" given its "important role in the adoption of ETSI's IPR Policy." (*Id.* ¶¶ 18, 22.) He explains that this would necessarily result in a finding that "the right to obtain a FRAND license includes a benefit for component-level—as well as end-device— manufacturers" and that "French law does not support an interpretation of Clause 6.1 of the ETSI IPR Policy to mean that an IPR owner need only grant licenses for end-user devices based on the price of those devices as opposed to the SSPPU

component-level pricing." (*Id.* ¶ 70; *see also id.* ¶ 52 ("French law does not preclude use of SSPPU as the royalty base.").)

Having considered the parties' expert declarations and in light of its own independent research, the Court finds that the parties to the ETSI IPR policy did not intend to impose a requirement that every FRAND license must be based on the SSPPU. This is evidenced not only by the lack of express language to that effect in the FRAND commitment, but also by ETSI's affirmative representation that "[t]he basic principle of the ETSI IPR regime remains FRAND with no specific preference for any licensing model." *ETSI Guide on Intellectual Property Rights (IPRs), Version Adopted by Board # 94* (Sept. 19, 2013). Even if the Court were to interpret "FRAND" from the perspective of a reasonable person in the same situation either at the present time or at the time the policy was adopted, the Court would arrive at the same conclusion. Several independent sources confirm that the prevailing industry standard or approach has been to base FRAND licenses on the end-user device and not on the SSPPU. *See* Kjelland, Kurt, Brooks, Roger G., & Zhang, Xiaolin, *FRAND Licensing of Standard Essential Patents, in* PATENTS AND STANDARDS PRACTICE, POLICY, AND ENFORCEMENT 11–8 (Michael L. Drapkin et al. eds., *Bloomberg Law* Book Division 2018) ("Three authors with long and wide experience in licensing in the cellular industry have written that 'In our experience, all significant patent holders in the cellular communications industry use the device price as the royalty base.'"); Siebrasse, Norman V. & Cotter, Thomas F., *Judicially Determined FRAND Royalties, in* THE CAMBRIDGE HANDBOOK OF TECHNICAL STANDARDIZATION LAW 374–75, 377–86 (Jorge L. Contreras ed., Cambridge University Press 2018). Given this practice and the absence of an express requirement to base a FRAND royalty on a component, rather than an end-user device, a reasonable person in the same situation would not interpret FRAND to mean that the license *must* be based on the SSPPU.

In addition, the Court has found no evidence that a French court would imply such a requirement based on equity or legislation. C. Civ. art. 1194. It is not necessarily the case that equity requires a FRAND rate to *always* be based on the SSPPU, as such it will depend on the particular SEPs and licensees at issue. The Court is also not aware of any statutes that would imply such a term either. The French Civil Code explicitly provides for the freedom of contract, which includes the freedom "to determine the content and form of the contract." C. Civ. art. 1102.

## IV. CONCLUSION

Based on the foregoing analysis, the Court therefore holds that as a matter of French law, the FRAND commitment embodied in the ETSI IPR policy does not require a FRAND license to be based on the SSPPU. To be clear, the ETSI IPR policy neither *requires* nor *precludes* a license with a royalty based on the SSPPU. Rather, whether a license meets the requirements of FRAND will depend on the particular facts of the case, as there is no prescribed methodology for calculating a FRAND license. *See* Siebrasse, Norman V. & Cotter, Thomas F., *Judicially Determined FRAND Royalties, in* THE CAMBRIDGE HANDBOOK OF TECHNICAL STANDARDIZATION LAW 377–86 (Jorge L. Contreras ed., Cambridge University Press 2018) (summaries of final FRAND rate determinations made in bench trials to date, in which courts employed various methodologies to calculate the FRAND rate); *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1231 (Fed. Cir. 2014) (in calculating RAND license, the Federal Circuit held that "[a]lthough we recognize the desire for bright line rules and the need for district courts to start somewhere, courts must consider the facts of record when instructing the jury and should avoid rote reference to any particular damages formula"); *TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. CV 15-2370 JVS(DFMX), 2018 WL 4488286, at *54 (C.D. Cal. Sept. 14, 2018) ("The Court concludes there is no single rate that is necessarily FRAND, and different rates offered to different licensees may well be FRAND given the economics of

the specific license."). As a result, the Court **GRANTS** Ericsson's Motion Under Fed. R. Civ. P. 44.1 for Determination of Foreign Law on Requiring SSPPU in Global Patent License Agreements, (Dkt. No. 210), to the extent and as particularly described and set forth herein.

**So ORDERED and SIGNED this 7th day of January, 2019.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE