**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| HTC CORPORATION and HTC AMERICA, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> TELEFONAKTIEBOLAGET LM ERICSSON and ERICSSON, INC., <br><br> Defendants. | Case No. 6:18-cv-00243-JRG <br><br> **PUBLIC REDACTED COPY OF DOCUMENT FILED UNDER SEAL PURSUANT TO** |

<u>**JOINT FINAL PRETRIAL ORDER**</u>

This cause came before the court at a pre-trial management conference held on January 23, 2019, pursuant to Rule 16 of the Federal Rules of Civil Procedure.

**A.     COUNSEL FOR THE PARTIES**

Plaintiff(s):   Jennifer H. Doan          David J. Burman
Joshua R. Thane          T. Andrew Culbert
HALTOM & DOAN          Susan Foster
6500 Summerhill Road,          Thomas Millikan
Suite 100          Jessica Everett-Garcia
Texarkana, TX 75503          PERKINS COIE LLP
Telephone: (903) 255-1000          1201 Third Avenue, Suite 4900
          Seattle, WA 98101
          Telephone: (206) 359-8000

Defendant(s):   Theodore Stevenson III
Samuel Baxter
Nicholas Mathews
Warren Lipschitz
Christine Woodin
Frank Vecella
MCKOOL SMITH, PC
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000

## B.     STATEMENT OF JURISDICTION

Jurisdiction is not disputed.

Subject matter jurisdiction in this case is based on supplemental jurisdiction over the "non-severed" claims due to federal question claims raised by the Sherman Act allegations set forth in the "severed" claims and/or 28 U.S.C. § 1332.[1]

## C.     NATURE OF ACTION

HTC alleges that Ericsson breached contractual obligations to license patents essential to certain standards on royalty terms that are fair, reasonable, and non-discriminatory ("FRAND"). HTC also alleges that Ericsson had a duty to make a good faith offer of a FRAND license, and that it breached this duty when it failed to do so.

Ericsson denies that it breached its contractual obligations and denies that it failed to offer HTC fair, reasonable and non-discriminatory license terms.

Ericsson also alleges that HTC had an obligation to negotiate with Ericsson in good faith for a license to Ericsson's essential patents, and that HTC breached that obligation.  HTC denies that it has any such obligations under Ericsson's contract with ETSI.  HTC contends that it is only a third-party beneficiary to that contract, and that as such it cannot breach that contract.  HTC further contends that even if it had such a contractual obligation under Ericsson's contract with ETSI, HTC has always acted in good faith and therefore could not have breached.

The only claims and counterclaims set for trial are the "Non-Severed" claims as set forth in the Court's November 7, 2018 order (Dkt. 220), which severed and stayed HTC's past damages

---

[1] HTC understands that there is a possibility that the factual record as it has developed in this case reveals that no subject matter jurisdiction exists over the non-severed claims, by themselves, under 28 U.S.C. § 1332(a)(3), in that § 1332(a)(2) requires complete diversity, while § 1332(a)(3) requires a legitimate dispute between the domestic entities in this matter. Ericsson disagrees with this position.

claims, and retained the parties' claims and counterclaims directed to future relief.

**D.     CONTENTIONS OF THE PARTIES**

i.  HTC's Statement of its Contentions

HTC makes the following contentions, subject to its pending motions, including its motions *in limine* (Dkt. 365) and its motion to compel arbitration of Ericsson's counterclaims three and four (Dkt. 396).  HTC statement of its contentions is general only and is not intended to, and should in no way be interpreted, to waive any contentions it has previously asserted in this litigation, whether in discovery, by motion, or otherwise.

This case involves wireless communications networks and the ability of devices to connect to and operate on those wireless networks using agreed-upon standards. These standards allow such devices to interoperate with one another through wireless communication networks (cellular telecommunication networks and "Wi-Fi" networks), even if the devices are made by different manufacturers, the infrastructure equipment is manufactured by different companies, and the networks are operated by different providers. The standards are set by what are known as standards setting organizations, or "SSOs."  Two are pertinent here: the European Telecommunications Standards Institute (ETSI), which is and has been a partner to the Third Generation Partnership Project (3GPP) and has overseen the development of the wireless communications networking standards known as 3G and 4G; and the Institute of Electrical and Electronics Engineers (IEEE), which has overseen the wireless networking standard known as 802.11 or WLAN, marketed under the name Wi-Fi.

Competing for-profit private companies are among the members of standards setting organizations.  When a standards setting organization establishes a standard, the standard often implements technology developed by one or more of those members who participated in drafting

the standard. If this technology is or later becomes covered by a patent, and the patent owner believes it is not technically possible to implement the standard without infringing the patent, the patent is called a Standard Essential Patent, or "SEP." Thus, for example, if a mobile phone manufacturer (sometimes called a standards implementer) wishes to utilize a particular wireless communications standard, it must ensure that it has the right to use each of the Standard Essential Patents that relate to the standard, if only to avoid costly litigation.

To deal with this potential conflict of interest by SSO members who seek standard essential status, and to ensure that implementers are able to obtain the right to use the Standard Essential Patents that are incorporated into a standard, SSOs have what is known as an intellectual property rights (or "IPR") policy. Such policies generally require SEP owners to do two things before their patent(s) are incorporated into a standard. First, they must declare the patent(s) that they believe are or may become essential to the standard. That does not mean that those patents are in fact essential.  And second, they must commit to licensing their essential patent(s) to companies that practice the standard, and must do so on fair, reasonable, and non-discriminatory terms, and not just on whatever terms they can negotiate from their position of strength.  Both ETSI and IEEE have such IPR policies.

Different SSOs express these licensing obligations in somewhat different ways.  For example, ETSI requires that SEP owners be prepared to grant licenses on terms that are fair, reasonable, and non-discriminatory (FRAND), while the IEEE requires that SEP owners grant licenses on reasonable terms that are free from unfair discrimination (often called RAND).  You can consider FRAND and RAND interchangeable.[2]

---

[2] Ericsson disagrees with this statement and objects to it being read to the jury because it mistakenly equates the ETSI and IEEE IPR Policies. *See* Dkt. No. 364 (Ericsson's Motions in *Limine* at 8 (MIL No. 6)).

Because many companies declare patents essential to standards, an implementer may need many licenses.  The combined royalties to each SEP holder result in an aggregate royalty for the standard as a whole.

The plaintiffs in this case are HTC Corporation and its wholly-owned United States subsidiary, HTC America, Inc. For convenience, I will refer to both, together, as HTC. The defendants are Telefonaktiebolaget LM Ericsson and its wholly-owned United States subsidiary Ericsson, Inc., and I will refer to both defendants, together, as Ericsson.

HTC is an implementer.  It designs, manufactures, and sells smartphones and other products. HTC was an early pioneer in the development of smartphone technology, and has been recognized for its innovations. HTC invests in research and development and recoups its R&D expenses with the sale of its products, and HTC's phones offer features that consumers find attractive.  The smartphones sold by HTC are compliant with one or more of the second generation (2G), third generation (3G), fourth generation (4G), and Wi-Fi wireless communications networking standards. HTC was a member of ETSI from approximately 2008 until 2016 and has declared some of its patents essential.

Ericsson makes and sells networking infrastructure equipment, software and services (base stations and antennae, core network equipment, and supporting software and services) that are compliant with the wireless communications networking standards.  Ericsson is a member of ETSI and IEEE, and owns patents that it has declared are essential to the 2G, 3G, 4G, and Wi-Fi standards.

██████████████████████████████████████████ HTC contends that, ███████████████, Ericsson refused to provide HTC with FRAND terms for a license to Ericsson's wireless communications networking SEPs, instead making a non-FRAND

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████   So HTC brought this lawsuit in April 2017 seeking a declaration that Ericsson had not met its obligations to standards setting organizations and its duties of good faith and fair dealing related to those obligations.

Among other things, HTC contends that:

1.  For an individual or aggregate royalty to be fair and reasonable, it must reflect only the value of the invention(s) provided by wireless networking SEPs, and not any value resulting from inclusion of the SEPs in the standard, nor any value of the network created by the standards, nor the value of other inventions and features of a multi-component device such as a smart phone. Ericsson's ████████████ ████████████ was therefore not fair and reasonable.

2.  For an individual or aggregate royalty to be fair and reasonable, it must not result from anticompetitive conduct nor be based on comparison to license royalty terms that might reflect more than the value of the invention(s) provided by wireless networking SEPs. Ericsson's ██████████████████ was therefore not fair and reasonable.[3]

3.  For an individual licensor's royalty to be fair and reasonable, it must reflect the licensor's proportional share of a fair and reasonable total aggregate royalty. Ericsson's ██████████████████ was therefore not fair and reasonable.

---

[3] Ericsson believes this statement should be precluded because it implies that Ericsson has violated antitrust laws, which is not a claim in this case. *See* Dkt. No. 364 (Ericsson's Motions in *Limine*) at 5 (MIL No. 3)).  HTC disagrees, in part because this is a mere statement of contentions, as well as for the reasons set forth in its oppositions to Ericsson's motions to exclude and motion *in limine* concerning this topic.

4. For a royalty demanded of an individual implementer to be fair and nondiscriminatory, it must be substantially similar to that of any licensee competing in the same product market, or else the variation must offset other terms or other explained and valid considerations.   Ericsson's ███████████████ was therefore discriminatory and Ericsson provided no explanation of any valid basis for the apparent discrimination.

5. For a royalty demanded of an individual implementer to be fair and  reasonable, the patentee must not seek compensation for patent claims that have been exhausted or for which it has no recourse against the implementer.

6. ████████████████████████████████████████ ████████████████████████████████████

## ii.  Ericsson's Statement of its Contentions:

By providing these contentions, Ericsson does not concede that all of these issues are appropriate for trial.  In particular, Ericsson does not waive any motions *in limine*, motions for summary judgment, *Daubert* motions, or motions to strike, which, if granted, would render some or all of these issues moot.  Ericsson's contentions in this case are detailed in its Answers, Counterclaims, and FRAND contentions, all of which are incorporated herein by reference.

In sum, Ericsson contends the following:

1. Ericsson is a leader in the development of the 2G, 3G and 4G cellular standards. Ericsson invested hundreds of millions of dollars to develop this technology and has been granted hundreds of 2G, 3G and 4G essential patents by governments all over the world.  Ericsson licenses its patents to cell phone makers such as Apple, Samsung, LG, Sony and Panasonic.  All of these companies, and many others, have agreed to pay Ericsson a fair rate to use Ericsson's technology.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.[4]

    2.     HTC makes, has made, uses, sells and/or offers for sale products that implement the 2G, 3G, and 4G standards and infringe Ericsson's 2G, 3G, and 4G patents.  HTC requires a license from Ericsson.[5]

    3.     Ericsson fully complied with its voluntary FRAND assurance as set forth in its IPR declarations to ETSI, as well as ETSI's IPR Policy and any applicable laws by, among other things, attempting to negotiate in good faith with HTC ███████████████ and offering a license to its essential patents on FRAND terms.

    4.     Ericsson at all times negotiated with HTC in good-faith regarding a license to Ericsson's patents.

    5.     HTC breached its obligation to negotiate with Ericsson in good-faith. For example, HTC brought this lawsuit when Ericsson ██████████████████████████ HTC ████████████████████████████████████████ ██████████████████████████████ a pretext as it prepared to file a lawsuit against Ericsson.  HTC also failed to make any reasonable offers for a license to Ericsson's standard essential patents which itself demonstrates HTC's lack of good faith.

    6.     Ericsson's ███████████████ to HTC are fair and reasonable because they reflect the value of Ericsson's standard essential patents.  Marketplace evidence as reflected in Ericsson's

---

[4] HTC disagrees with the last three sentences of this paragraph and objects to them being read to the jury, including because they are ambiguous, because they are disputed and/or not accurate, and because this is not a patent infringement litigation.

[5] HTC disagrees with this paragraph and objects to it being read to the jury including because it is ambiguous, because it is disputed and/or not accurate (HTC is beneficiary of the Qualcomm passthrough, at a minimum), and because this is not a patent infringement litigation.

licenses with third-parties, confirms that Ericsson's ████████ are fair and reasonable.  Further evidence that Ericsson's offers to HTC are fair and reasonable is set forth in the witness declarations of Stefan Parkvall and Todd Cason and in the expert reports of David Cooper, William Wecker, Claude Royer, Mark Jones, and Robert Mills, and for the factual reasons explained by Ericsson's witnesses at trial.

7.      Ericsson's ████████████████ were nondiscriminatory.  This is evidenced by Ericsson's recent licenses with companies "similarly situated" to HTC and by the fact that Ericsson's proposed royalties do not cause HTC competitive harm.   Further evidence that Ericsson's offers to HTC are nondiscriminatory is set forth in the expert reports of Robert Mills and Bertram Huber, and for the factual reasons explained by Ericsson's witnesses at trial.

8.      Ericsson's voluntary FRAND assurance to ETSI does not mandate that Ericsson license with "SSPPU" as the royalty base.  Further, the SSPPU for Ericsson's patents is not the baseband processor. HTC failed to satisfy its burden that the cost or profit of a baseband processor reflects the value of Ericsson's technology.

9.      Ericsson's sale of infrastructure equipment to wireless operators does not give rise to an implied license to HTC for the sale of its cell phones.[6]  Ericsson has not exhausted any handset patent claims through its sale of network infrastructure.  Ericsson has not exhausted any handset patent claims for 2G or 4G through any licenses with third parties.

---

[6] HTC disagrees with this statement as it misapprehends HTC's position.  HTC has not contended that it has an implied license to Ericsson's patents based on Ericsson's sale of infrastructure equipment to wireless network.  ████████████████
████████████████████████
████████████████████
████████████████████████
████████████████████████████
████████████████████

10.    Ericsson ███████████████████████████ that would allow HTC to assess whether Ericsson's offers complied with FRAND.

11.    HTC is bound to accept either Ericsson's ███████████.

12.    Ericsson is entitled to an injunction requiring HTC to enter into a license—for HTC's past unlicensed and future sales—with Ericsson upon the FRAND terms and conditions that Ericsson has offered to HTC, or on terms and conditions that would not be inconsistent with Ericsson's voluntary FRAND assurance.

13.    Ericsson has not breached the IEEE-SA patent policy. ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████

iii.  HTC's Statement of its Contentions as to Ericsson's Counterclaims

As to the first counterclaim (No Breach of FRAND), HTC contends that Ericsson breached its FRAND assurances as previously discussed, and thus that Ericsson is not entitled to a declaration to the contrary.   As to the remaining counterclaims, HTC contends that it did not, and could not breach any duties of good faith, and that it did not repudiate its rights associated with Ericsson's FRAND declarations. Among other things, HTC specifically contends that:

1.    HTC's ██████████████ was based on information available to it, substantial legal authority concerning the determination of a fair and reasonable royalty on SEPs subject to FRAND, as well as on accepted valuation

methodologies.

2. HTC disclosed the basis for its █████████████████████████

███████████████████████████████████████████████

3. HTC has no contractual obligations under Ericsson's contracts with ETSI or the
   IEEE that could be breached by HTC.

4. HTC brought this lawsuit only after it concluded that ██████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

HTC contends that information provided in these proceedings has indeed revealed
that ████████████ was not FRAND.

5. HTC did not, and did not intend to, repudiate its rights to license Ericsson's SEPs
   on FRAND terms.


**E.     STIPULATIONS AND UNCONTESTED FACTS**

1.     The parties agree to, and so hereby stipulate, to the dismissal of Ericsson's
Counterclaim II with prejudice.

2.     The parties do not contest that, in this action, the Court has personal jurisdiction
over the parties.

3.     Venue is proper in this action in this Court.

4.     Plaintiff HTC Corporation is a Taiwanese corporation with its principal place of
business in Taipei, Taiwan.

5.     Plaintiff HTC America, Inc. is a Washington corporation with its principal place of
business in Seattle, Washington.

6.      HTC America is a wholly-owned United States subsidiary of HTC Corporation that sells devices in the United States that are compliant with one or more of the 2G, 3G, 4G, and Wi-Fi wireless communication networking standards.

7.      Telefonaktiebolaget LM Ericsson is a corporation organized under the laws of the Kingdom of Sweden with its principal place of business in Stockholm, Sweden.

8.      Ericsson Inc. is a Delaware corporation with its principal place of business in Plano, Texas.

9.      Ericsson Inc. is an indirectly, wholly-owned United States subsidiary of Telefonaktiebolaget LM Ericsson.

10.     Ericsson has declared to ETSI, and to 3GPP via ETSI, that it owns patents that are essential to the 2G, 3G, and 4G standards, and that it is prepared to grant licenses in accordance with its IPR licensing declarations.

11.     HTC has standing to enforce the Ericsson's licensing declarations made to ETSI as a third-party beneficiary.

12.     French law governs the obligations under the licensing declarations submitted by Ericsson to ETSI.


HTC also believes that the following facts are uncontested as judicial admissions..  HTC has therefore cited the paragraph number of Ericsson's Answer (Dkt. 156), which forms the basis of each asserted uncontested fact. Ericsson does not stipulate to the following and disputes that it consists of undisputed facts.

1.      Ericsson Inc. is an indirectly, wholly-owned United States subsidiary of Telefonaktiebolaget LM Ericsson.  Dkt. 156 at ¶ 15.

2.      Ericsson Inc. asserts, when granted the right to do so by Telefonaktiebolaget LM Ericsson, standard essential patents that are part of Telefonaktiebolaget LM Ericsson's standard essential patent portfolio.  Dkt. 156 at ¶ 15.

3.      Every major mobile network operator in the world buys solutions and/or services from Ericsson.  Dkt. 156 at ¶ 10.

4.      The European Telecommunications Standards Institute ("ETSI") is a non-profit standard setting organization governed.  Dkt. 156 at ¶ 25.

5.      ETSI has over eight-hundred (800) members, including Ericsson.   Dkt. 156 at ¶ 25.

6.      ETSI members include cellular service providers, network infrastructure manufacturers, mobile wireless device manufacturers, and manufacturers of components in these devices.  Dkt. 156 at ¶ 30.

7.      ETSI is the organization that maintains and develops the 2G, 3G, and 4G wireless communication networking standards.  Dkt. 156 at ¶ 25.

8.      2G is a family of telecommunications standards that includes GSM (Global System for Mobile Communications), GPRS (General Packet Radio Services), and EDGE (Enhanced Date Rates for GSM Evolution).

9.      3G is a family of telecommunications standards that includes UMTS (Uniform Mobile Telecommunications Service), W-CDMA (Wideband Code Division Multiple Access), and HSPA (High Speed Packet Access).  Dkt. 156 at ¶ 16.

10.     4G is a family of telecommunications standards that includes LTE (Long Term Evolution) and LTE-Advanced.  Dkt. 156 at ¶ 16.

11.     Wireless communication networking standards, such as the 2G, 3G, and 4G

standards, allow for interoperability. Dkt. 156 at ¶ 28.

12.     Under the ETSI IPR Policy, a patent is essential to a standard where it is not possible on technical (but not commercial) grounds, taking into account the normal technical practice and state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate a device that complies with a standard without infringing that patent.  Dkt. 156 at ¶ 34.

13.     The ETSI IPR Policy requests that a patent holder give an undertaking that it is prepared to grant licenses to what it considers essential patents on fair, reasonable, and non-discriminatory (FRAND) terms and conditions.  Dkt. 156 at ¶ 5.

14.     The ETSI IPR Policy in Clause 6.1 states that, after an essential patent is identified, the Director-General of ETSI "shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ("FRAND") terms and conditions."  Dkt. 156 at ¶ 35.

15.     The ETSI declaration form for essential patents states: "To the extent that the IPR(s) disclosed in the attached IPR Information Statement Annex are or become, and remain ESSENTIAL in respect of the ETSI Work Item, STANDARD and/or TECHNICAL SPECIFICATION identified in the attached IPR Information Statement Annex, the Declarant and/or its AFFILIATES are (1) prepared to grant irrevocable licences under this/these IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy; and (2) will comply with Clause 6.1bis of the ETSI IPR Policy."  Dkt. 156 at ¶ 35.

16.     Article 19 of ETSI's Rules of Procedure provide for amendments to ETSI's Statutes and Rules of Procedure. Amendments to the Rules of Procedure—including amendments to their Annexes, which include the ETSI IPR Policy—require that, if consensus is not reached as to the

amendment, at least 71% of the total weighted votes be cast in favor of the amendment.  Dkt. 156 at ¶ 87.

17.     Ericsson is a member of the Institute of Electrical and Electronics Engineers Standards Association ("IEEE-SA").  Dkt. 156 at ¶¶ 39, 47.

18.     IEEE-SA is the standards-development arm of the Institute of Electrical and Electronics Engineers ("IEEE"). Dkt. 156 at ¶ 39.

19.     Ericsson has contributed to the wireless local area network ("WLAN") standard. Dkt. 156 at ¶ 47.

20. Ericsson has patents essential to the WLAN standard.  Dkt. 156 at ¶ 51.

## F.     CONTESTED ISSUES OF FACT AND LAW[7]

By providing these Statements, the parties do not concede that all of these issues are appropriate for trial, including in front of the jury.  In addition, the parties do not waive any of their pending motions or objections.[8]  Any issues of fact that are determined to constitute issues of law are hereby to be considered as such, and *vice versa*.

### i. HTC's statement of the contested issues of law and fact.

HTC believes the following issues are contested issues of law or fact for trial, but Ericsson disagrees.

1.     Whether HTC has proven by a preponderance of the evidence that ███████████ ███████████████████████████████ was not fair.

2.     Whether HTC has proven by a preponderance of the evidence that ██████████████

---

[7] The contested issues that follow may be changed before trial, based on the Court's rulings on the pending motions set forth *infra*.
[8] This includes but is not limited to HTC's contentions as to burden(s) of proof.

████████████████████████████████████ was not reasonable.

3.      Whether HTC has proven by a preponderance of the evidence that ███████████
████████████████████████████████ was discriminatory.

4.      Whether HTC has proven by a preponderance of the evidence that Ericsson
breached duties of good faith and fair dealing.

5.      Whether ████████████████████████████████████████████████
████████████████████████████████████████ violated duties of good faith and fair
dealing.

6.      Whether Ericsson's ████████████████████████ breached its FRAND
obligations.

7.      Whether ████████████████████████████████████████████████
████████████████████

8.      Whether Ericsson's sales of network infrastructure equipment and software (base
station and core-networking equipment and software) to mobile communications providers, and
Ericsson's work with the mobile communications providers to create and implement the wireless
communications networks, results in an exhaustion of Ericsson's patent rights otherwise applicable
to HTC's phones.

9.      Whether mobile communications providers and their customers have an implied
license to practice Ericsson's 2G, 3G, and 4G standard essential patents in operating and using the
mobile communications providers' networks.

10.     Whether as a result of any implied license held by mobile communications
providers and their customers, Ericsson is unable to seek royalties on patents it has declared
essential to the 2G, 3G, and 4G standards.

11.     Whether Ericsson is collaterally estopped from denying that ███████ ███████████████████ were unfair and unreasonable.

12.     Whether Ericsson is collaterally estopped from denying that ███████ ███████████████ were discriminatory.

13.     Whether Ericsson is collaterally estopped from arguing facts that are inconsistent with facts expressly or necessarily found by the Honorable Judge Selna in his Findings of Fact and Conclusions of Law in *TCL Communication Technology Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, Case No. 14-cv-00341-JVS (N.D. Cal.).

14.     Whether HTC had any contractual duties under Ericsson's contract with ETSI that could be breached by HTC in license discussions with Ericsson, and if so, whether HTC breached any such duties in those license discussions, including by seeking a court declaration that Ericsson's ███████████████ did not comply with Ericsson's FRAND obligations and breached Ericsson's duties of good faith and fair dealing.

15.     Whether Ericsson has proven by a preponderance of the evidence that HTC breached an obligation to negotiate in good faith for a license to Ericsson's 2G, 3G and 4G essential patents.

16.     Whether HTC repudiated its rights to enforce Ericsson's FRAND obligations.

17.     Whether any breach by HTC excuses Ericsson from performing its FRAND obligations.

18.     Whether Ericsson's counterclaims III and IV are subject to mandatory arbitration.

19.     Whether Ericsson's counterclaims are barred in whole or in part by its failure to mitigate any alleged harm.

20.     Whether Ericsson's counterclaims are barred in whole or in part by the doctrine of

unclean hands.

### ii. Ericsson's statement of the contested issues of law and fact.

Ericsson believes the following issues are contested issues of law or fact for trial, but HTC disagrees.

1. Whether HTC has proven by a preponderance of the evidence ███████████ ██████████████████████████████████████████were not fair, reasonable and non-discriminatory.

2. Whether HTC has proven by a preponderance of the evidence that Ericsson breached an implied covenant of good faith and fair dealing.

3. Whether Ericsson has proven by a preponderance of the evidence that HTC breached its obligation to negotiate in good faith for a license to Ericsson's 2G, 3G and 4G essential patents.


### G. LIST OF WITNESSES

HTC's list of trial witnesses is attached as Exhibit 1.

HTC's deposition designations are attached as Exhibit 2.

Ericsson's list of trial witnesses is attached as Exhibit 3.

Ericsson's deposition designations are attached as Exhibit 4.

### H. LIST OF EXHIBITS

HTC's exhibit list is attached as Exhibit 5.

Ericsson's exhibit list is attached as Exhibit 6.

I.      **LIST OF ANY PENDING MOTIONS**

*HTC's Motions:*

1.      HTC's Motion for Partial Summary Judgment Based on Collateral Estoppel, Dkt. 84 (filed 5/31/18, superseded at Dkt. 111);

2.      HTC's Motion for Partial Summary Judgment Based on Collateral Estoppel, Dkt. 111 (filed 7/6/18);

3.      HTC's Motion for Partial Summary Judgment on HTC's Count I and Summary Judgment on Ericsson's Counterclaim I, Dkt. 237 (filed 11/29/18);

4.      HTC's Motion for Summary Judgment on Ericsson's Counterclaims II-IV, Dkt. 238 (filed 11/29/18);

5.      HTC's Motion to Exclude Expert Testimony of Dr. David Cooper Regarding Essentiality, Dkt. 254 (filed 11/29/18);

6.      HTC's Motion to Exclude Certain Testimony of Dr. Bertram Huber on the Value of Cellular Connectivity and Legal Obligations under the ETSI IPR Policy, Dkt. 255 (filed 11/29/18);

7.      HTC's Motion to Exclude Robert Mills Expert Testimony Regarding the Value of Cellular Connectivity, Dkt. 256 (filed 11/29/18);

8.      HTC's Motion to Strike, or in the Alternative Exclude, Testimony Relied upon by Dr. Bertram Huber, Dkt. 257 (filed 11/29/18);

9.      HTC's Motion to Strike Expert Testimony of Ericsson Employees Dr. Parkvall and Mr. Cason, Dkt. 258 (filed 11/29/18);

10.      HTC's Motion to Stay Trial Date Pending Arbitration (Dkt. 355);

11.      HTC's Motions *in Limine*, Dkt. No. 365 (filed 1/04/19); and

12.     HTC's Motion to Sever, Stay, and Compel Arbitration of Defendants' Counterclaims III and IV (Dkt. 396)

***Ericsson's Motions:***

13.     Ericsson's Motion to Supplement the Record on HTC's Partial Motion for Summary Judgment of Collateral Estoppel with New Evidence, Dkt. 137 (filed 8//22/18);

14.     Ericsson's Motion for Summary Judgment, Dkt. 245 (filed 11/29/18);

15.     Ericsson's Motion to Strike HTC's "Supplemental" Expert Reports Served in Violation with the Court's Docket Control Order, Dkt. 251 (filed 11/29/18);

16.     Ericsson's Motion to Strike HTC Expert Opinions Relating to the Burden of Proof Relating to Claims Severed and Stayed by the Court, Dkt. 252 (filed 11/29/18);

17.     Ericsson's Daubert #1: Motion to Exclude HTC's Experts' Opinions Seeking to Construe the Terms of a 1994 Contract Based on Present-Day Economic Policy Arguments, Dkt. 263 (filed 12/02/18);

18.     Ericsson's Daubert #2: Motion to Exclude Theoretical Opinions Related to Hold-Up, Dkt. 259 (filed 12/02/18);

19.     Ericsson's Daubert #3: Motion to Exclude the Opinions of Drs. Perryman and Lynde Related to Top-Down SSPPU Approach, Dkt. 260 (filed 12/02/18);

20.     Ericsson's Daubert #4: Motion to Exclude Theoretical Opinions Related to Royalty Stacking, Dkt. 261 (filed 12/02/18);

21.     Ericsson's Daubert #5: Motion to Exclude Expert Opinions of Dr. Kakaes and Dr. Wolfe, Dkt 262 (filed 12/02/18); and

22.     Ericsson's Motions *in Limine*, Dkt. No. 364 (filed 1/04/19).

J.     **PROBABLE LENGTH OF TRIAL**

The parties understand that the Court has made five days available for the trial.

HTC believes that ten days is required, but if the length of trial is five days, HTC proposes 17 hours per side.  HTC further proposes that each side be allocated 30 minutes for *voir dire*, 45 minutes for opening statements, and 45 minutes for closing arguments.  HTC also understands that the Court will determine the parties' equitable claims for relief and equitable defenses, after the jury has returned its verdict.

Ericsson proposes 17 hours per side and that each side have 40 minutes for *voir dire* and 40 minutes for opening statements, with time for closing arguments to be determined at the discretion of the Court.  Ericsson acknowledges that these limits are higher than the Court typically orders in patent infringement cases but believes the additional time is warranted given the nature of the issues in this breach of contract case.


K.     **MANAGEMENT CONFERENCE LIMITATIONS**

*(Note: The parties shall set forth any limitations agreed upon or ordered by the court at or after the management conference set forth in Local Rule CV-16, such as a time limit on the length of trial, limitations on the number of experts a party may call, limitations on the length of video depositions, the use of deposition summaries, etc.)*


L.     **TRIAL MANAGEMENT PROCEDURES**

**Patent Video**

Ericsson requests that the Court play the Federal Judicial Center patent video prior to voir dire given the patent issues relevant in this breach of contract case.  HTC disagrees with this request because this is not a patent infringement litigation.

## Witnesses

The parties will identify witnesses to be called live (in the order of the call) by 7:30 pm[9] two days before the day of the trial during which the witnesses will testify.  For example, if a witness will testify on a Wednesday, the party calling that witness must identify the witness and the order in which the witness will be called by 7:30 pm on Monday.

## Demonstratives

*Definition of Demonstratives; form of exchange, first use.*   The term "demonstrative" includes graphics, and animation demonstratives, or slides with graphics and animation demonstratives, but does not include images or enlargements of exhibits, deposition transcripts, or trial testimony in this case or underlining, highlighting, or similar emphasis on such exhibits or transcripts.   However, adding a narrative heading to an excerpt from an exhibit or deposition transcript shall convert such material into a demonstrative.   Parties are to provide animated demonstratives natively or by other electronic means such that animations are readily ascertainable. Demonstratives exchanged may not be used by the opposing party before being used by the disclosing party.

*Exchange of demonstratives.*   At 7:30 p.m. on the day prior to each trial day, each party will disclose to the other party, for opening statements and each witness that will testify the following day, any demonstratives that it intends to use with that witness during direct examination or during opening statements. At 9:00 p.m., the non-offering party shall notify the offering party of any objections to the proposed demonstratives. The parties will meet and confer by 9:30 p.m. to attempt to resolve any objections or other issues relating to the disclosed demonstratives. If any disputes remain following this conference, the parties shall apprise the Court that evening by 10:30 p.m.

---

[9] All times listed in this order are Central Time zone.

The parties need not exchange copies of demonstrative exhibits to be used only during cross-examination (including cross-examination of an adverse witness called by a party as part of its own case).

*Inspection of non-documentary demonstratives.* The parties will make available for inspection all non-documentary demonstratives, such as physical demonstrative exhibits or live demonstrations, they plan to use at trial for use during direct examination by 7:30 p.m. two calendar days before their intended use. The parties shall provide objections to such demonstratives by 7:30 p.m. the day before their intended use, and shall meet and confer on any objections at 9:30 p.m.  If any disputes remain following this conference, the parties shall apprise the Court that evening by 10:30 p.m.

*Exchange of closing demonstratives.*

Demonstratives must be cleared of any pending objections before being shown to the jury.

*Other procedures concerning demonstratives*

The parties have agreed that demonstratives may not go to the jury during deliberations.

## **Exhibits**

*Exhibit use in opening statements.*  Each party may display to the jury during opening statements any exhibit that is pre-admitted and that the party reasonably believes will be used at trial. The jury will not be shown any exhibit during opening statement that a party does not plan to introduce during trial.

If a party wishes to display, during opening statements, any exhibit for which objections remain pending, the parties will follow the procedure set forth below for resolving objections to the use of exhibits during trial.

*Disclosing exhibits for use during trial.*

HTC Proposal

At 7:30 p.m. on the day prior to each trial day, each party will disclose to the other party, for each expected witness, any exhibits that it intends to use with that witness during direct examination. The parties' disclosures will reflect a good faith estimate of the exhibits that will be used with a particular witness and all efforts will be made to streamline disclosures such that they do not include excessive numbers of exhibits that do not ultimately get used.  At 9:00 p.m. on the day prior to each trial day, the non-offering party shall notify the offering party of any objections to the proposed exhibits. The parties will meet and confer by 9:30 p.m. to attempt to resolve any objections or other issues relating to the disclosed exhibits. If any disputes remain following this conference, the parties shall apprise the Court by 10:30 p.m.   The parties need not disclose the exhibits it intends to use during cross-examination (including cross-examination of an adverse witness called by a party as part of its own case).

Ericsson Proposal

Ericsson disagrees with this proposal because the parties are working diligently to preadmit their exhibits. Thus there is not a need to disclose the use of exhibits prior to direct examination.

*Other procedures concerning exhibits.*

If a party provides a binder of exhibits to a witness prior to examination, the party will provide one copy to the other party.

The parties agree that any party may use any document on the other party's exhibit list to the same extent it would be able to use that document had it been listed on their own exhibit list (i.e., the failure or oversight of a party to identify a document on their exhibit list that is already on the other party's exhibit list will not itself be a basis for objecting to the document's use), subject to any objection that might otherwise apply (e.g., a hearsay or foundational objection to a party's

use of its own document). The parties agree that any description of a document on an exhibit list is provided for convenience only and shall not be used as an admission or otherwise as evidence regarding that document.

**Deposition Testimony**

*Use of deposition testimony in opening statements.*

HTC Proposal

During opening statements, each party may play or read to the jury any deposition testimony for which no objections remain pending, if the party reasonably believes the deposition testimony will be used at trial. The jury will not be read or played any deposition testimony during opening statement that a party does not plan to introduce during trial.

If a party wishes to read or play, during opening statements, deposition testimony for which objections remain pending, the parties will follow the procedure set forth below for resolving objections to the use of deposition testimony during trial.

Ericsson Proposal

Ericsson disagrees that a party may play or read to the jury deposition testimony during opening arguments.

*Disclosing deposition testimony for use during trial.*

The Court will resolve objections to deposition testimony on a rolling basis during trial. The parties must exchange deposition designations by 7:30 pm three days before the designations are to be played in trial. Objections and counter-designations must be exchanged by 7:30 pm two days before the deposition designations will be played.  Objections to counter-designations, and counter-counter-designations must be exchanged by 7:30 pm one day before the deposition designations will be played. The parties must meet and confer to resolve any objections by 9:30 p.m. one day

before the deposition designations will be played.  If any disputes remain following this conference, the parties shall apprise the Court by 10:30 p.m.

Each party must provide a timed report of the deposition designations to counsel prior to the designations being played at trial.

The party who seeks to introduce the deposition testimony will be responsible for preparing the video clips to be played, including the counter-designations made by the other side.

The parties shall remove counsel's objections or any discussion between counsel from the deposition video clips that are to be shown to the jury.

All designations and counter-designations for a given witness will be played in chronological order as they appear in the transcript.

Any deposition testimony may be used at trial for the purpose of impeachment, regardless of whether a party specifically identified that testimony on its list of deposition designation, if the testimony is otherwise competent for such purpose.

In lieu of lodging originally signed version of depositions with the Court, lodging copies of transcripts (signed or unsigned) is sufficient and will not preclude a particular deposition from being used at trial.

**M.   CERTIFICATIONS**

The undersigned counsel for each of the parties in this action does hereby certify and acknowledge the following:

(1)   Full and complete disclosure has been made in accordance with the Federal Rules of Civil Procedure and the Court's orders;

(2)   Discovery limitations set forth in the Federal Rules of Civil Procedure, the Local Rules, and the Court's orders have been complied with;

(3)   Each exhibit in the List of Exhibits herein:

    (a)   is in existence;

    (b)   is numbered; and

    (c)   has been disclosed and shown to opposing counsel.

Respectfully submitted,

*/s/ Theodore Stevenson,*
*III (w/permission)*
Theodore Stevenson, III lead counsel
TX State Bar No. 19196650
tstevenson@mckoolsmith.com
Nicholas Mathews
TX State Bar No. 24085457
nmathews@mckoolsmith.com
Frank Vecella
TX State Bar No. 20532500
fvecella@mckoolsmith.com
Warren Lipschitz
TX State Bar No. 24078867
wlipschitz@mckoolsmith.com
Chelsea A. Priest
TX State Bar No. 24102375
cpriest@mckoolsmith.com
Jonathan Powers
TX State Bar No. 24098277
jpowers@mckoolsmith.com
Erik B. Fountain
TX State Bar No. 24097701
efountain@mckoolsmith.com
Marcus L. Rabinowitz
TX State Bar No. 24098293
mrabinowitz@mckoolsmith.com
MCKOOL SMITH, PC
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

Kevin Burgess
TX State Bar No. 24006927
kburgess@mckoolsmith.com
Charles Fowler
TX State Bar No. 24083014
cfowler@mckoolsmith.com
Kevin Hess
TX State Bar No. 24087717
khess@mckoolsmith.com
Christine Woodin
TX State Bar No. 24199951
cwoodin@mckoolsmith.com

*/s/ Jennifer H. Doan*
Jennifer H. Doan
Texas Bar No. 08809050
Joshua R. Thane
Texas Bar No. 24060713
Cole A. Riddell
Texas Bar No. 24105423
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone: (903) 255-1000
Facsimile: (903) 255-0800
Email: jdoan@haltomdoan.com
Email: jthane@haltomdoan.com
Email: criddell@haltomdoan.com

David J. Burman
Andrew Culbert
Susan Foster
Kevin A. Zeck,
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
Email: DBurman@perkinscoie.com
Email: ACulbert@perkinscoie.com
Email: SFoster@perkinscoie.com
Email: KZeck@perkinscoie.com
Email: LHennessey@perkinscoie.com

Jessica Everett-Garcia
Perkins Coie LLP
2901 N Central Avenue, Suite 2000
Phoenix, AZ 85012-2786
Telephone: (602) 351-9165
Facsimile: (602) 648-7000
Email: jeverettgarcia@perkinscoie.com

**ATTORNEYS FOR PLAINTIFFS HTC
CORPORATION AND HTC AMERICA,
INC.**

MCKOOL SMITH, PC
300 W. 6th Street, Suite 1700
Austin, TX 78701
Telephone: (512) 692-8700
Telecopier: (512) 692-8744

Blake Bailey
bbailey@mckoolsmith.com
TX State Bar No. 24069329
MCKOOL SMITH, PC
600 Travis Street, Suite 7000
Houston, TX 77002
Telephone: (713) 485-7300
Telecopier: (713) 485-7344

**ATTORNEYS FOR DEFENDANTS
AND COUNTERCLAIM PLAINTIFFS
TELEFONAKTIEBOLAGET LM
ERICSSON AND ERICSSON INC.**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  All other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by certified mail, return receipt requested, on this 11th day of January, 2019.

*/s/ Jennifer H. Doan*
Jennifer H. Doan