```
1                  IN THE UNITED STATES DISTRICT COURT

2                  FOR THE EASTERN DISTRICT OF TEXAS

3                            TYLER DIVISION

4    HTC CORPORATION and HTC        )(

5    AMERICA, INC.,                 )(

6         PLAINTIFFS                )(    CIVIL ACTION NO.

7                                   )(    6:18-CV-243-JRG

8    VS.                            )(    TYLER, TEXAS

9                                   )(

10   TELEFONAKTIEBOLAGET LM         )(

11   ERICSSON and ERICSSON, INC.,   )(    FEBRUARY 15, 2019

12        DEFENDANTS                )(    8:25 A.M.
```

13                  <u>TRANSCRIPT OF JURY TRIAL</u>

14        <u>BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP</u>

15           <u>UNITED STATES CHIEF DISTRICT JUDGE</u>

16   APPEARANCES:

17   FOR THE PLAINTIFFS:      Ms. Jennifer H. Doan
                              Mr. Joshua R. Thane
18                            Mr. Cole A. Riddell
                              HALTOM & DOAN
19                            6500 Summerhill Road
                              Suite 100
20                            Texarkana, Texas 75503

21   COURT REPORTER:         Ms. Shelly Holmes, CSR, TCRR
                             Official Reporter
22                           United States District Court
                             Eastern District of Texas
23                           Marshall Division
                             100 E. Houston Street
24                           Marshall, Texas  75670

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)

```
 1   FOR THE PLAINTIFFS:      Mr. David J. Burman
                              Mr. T. Andrew Culbert
 2                            Ms. Shylah R. Alfonso
                              Ms. Susan E. Foster
 3                            Mr. Kevin A. Zeck
                              PERKINS COIE LLP
 4                            1201 Third Avenue
                              Suite 4900
 5                            Seattle, Washington 98101

 6                            Ms. Jessica Everett-Garcia
                              PERKINS COIE LLP
 7                            2901 N. Central Avenue
                              Suite 2000
 8                            Phoenix, Arizona 85012

 9                            Mr. Thomas N. Millikan
                              PERKINS COIE LLP
10                            11452 El Camino Real
                              Suite 300
11                            San Diego, California 92130

12                            Mr. Andrew N. Klein
                              PERKINS COIE LLP
13                            3150 Porter Drive
                              Palo Alto, California 94304

14

15   FOR DEFENDANTS:          Mr. Theodore Stevenson, III
                              Mr. Nicholas Mathews
16                            Mr. Warren Lipschitz
                              MCKOOL SMITH, PC
17                            300 Crescent Court
                              Suite 1500
18                            Dallas, Texas 75201

19                            Mr. Samuel F. Baxter
                              MCKOOL SMITH, PC
20                            104 East Houston Street
                              Suite 300
21                            Marshall, Texas 75670

22                            Ms. Christine M. Woodin
                              MCKOOL SMITH, PC
23                            300 West 6th Street
                              Suite 1700
24                            Austin, Texas 78701

25
```

```
 1                    P R O C E E D I N G S
 2          (Jury out.)
 3          COURT SECURITY OFFICER:  All rise.
 4          THE COURT:  Be seated, please.
 5          All right.  Counsel, are the parties prepared to
 6   read into the record those items from the list of
 7   pre-admitted exhibits used during yesterday's portion of the
 8   trial?
 9          MR. RIDDELL:  Yes, Your Honor.
10          THE COURT:  Please proceed.
11          MR. RIDDELL:  Cole Riddell for HTC.
12          HTC's exhibits introduced into evidence yesterday
13   are Plaintiff's Exhibit No. 73, 74, 76, 81, 104, 124, 130,
14   167, 250, 260, 357, 599, 1119, and 1125.
15          THE COURT:  Is there any objection from Defendant?
16          MR. FOUNTAIN:  No objection, Your Honor.
17          THE COURT:  Do Defendants have a similar rendition
18   to present?
19          MR. FOUNTAIN:  We do.  Erik Fountain for Ericsson.
20          Defendants' exhibits introduced into evidence
21   yesterday were DX-2, 3, 4, 7, 8, 9, 11, 13, 15, 16, 17, 18,
22   20, 21, 22, 51, 68, 77, all of DX-81, all of DX-82, DX-281,
23   343, and 665.
24          THE COURT:  All right.  Do Plaintiffs have any
25   objection to that rendition?
```

```
 1              MR. RIDDELL:  No objections, Your Honor.

 2              THE COURT:  All right.  Thank you, counsel.

 3              Let me ask this question.  With regard to closing

 4    arguments, who intends to closes for Plaintiffs and in what

 5    order?

 6              MS. DOAN:  Your Honor, I'm going to do the first

 7    part of the closing argument, and Mr. Burman is going to

 8    close after the Defendant does.

 9              THE COURT:  All right.  Do you want a warning on my

10    time, Ms. Doan?

11              MS. DOAN:  I think I have somebody back there

12    that's going to flag me down.  I would like a five-minute

13    warning, Your Honor.

14              I'm going to take 20 to 25 minutes, so if you could

15    give me a warning at 20 minutes.

16              THE COURT:  I'll warn you when you've used 20

17    minutes.  Remember, Plaintiffs have 35 minutes.

18              MS. DOAN:  Yes, Your Honor.

19              THE COURT:  And, Mr. Stevenson, am I right you're

20    going to close for Defendants?

21              MR. STEVENSON:  Yes, Your Honor.

22              THE COURT:  Would you like a warning on your time?

23              MR. STEVENSON:  Five minutes, please.

24              THE COURT:  Let me also ask this, counsel.  I'm

25    told by the Court Security Officer, which until this morning
```

```
 1   was unknown to me, that that podium swivels, that it is
 2   sometimes turned at a 45-degree angle for closing arguments
 3   so that it more or less faces the jury.  Didn't know that
 4   until this morning.
 5            Is anybody interested in having the Court Security
 6   Officer move -- let them do it.  You'll break it.
 7            Can you move it for us?
 8            COURT SECURITY OFFICER:  Yes, sir.
 9            THE COURT:  Let's go ahead and move it, we'll look
10   at what it looks like, and then we'll decide if we're going
11   to leave it this way or the other way.
12            MS. DOAN:  I think it's great, Your Honor.
13            THE COURT:  Mr. Stevenson, take a look, see what
14   you think.
15            Mr. Burman, you're welcome to do the same.
16            MR. BURMAN:  That's fine.
17            THE COURT:  So the consensus is we'll leave it
18   turned; is that right?
19            MS. DOAN:  All right.
20            MR. STEVENSON:  We've reached agreement.
21            THE COURT:  Hope springs eternal.
22            All right.  One other thing before I bring the jury
23   in, and I want to communicate this to our friends in the
24   gallery, as well as counsel at the bar.
25            Closing argument and the Court's final instructions
```

to the jury, in my opinion, are the most serious part of a
very serious process.

Consequently, once I start my final instructions,
to be followed by counsels' closing arguments, I don't want
any people coming or going from the courtroom unless I
should order the courtroom sealed.  I don't want any
talking.  I don't want any drinking of bottles of water
tipped up in the air.  I don't want any notes being passed.
I want you to be as quiet and as focused and as reverent as
you can be.  I don't want anything to disrupt from my
final -- disrupt my final instructions or counsels' closing
arguments.

If you have been reckless enough to bring an
electronic device into this courtroom that's in your purse
or in your pocket, make darned sure it is silent or turned
off.

All right.  Also, let me ask this.  I understand,
Ms. Doan, it's your request that I seal the courtroom for
your portion of Plaintiffs' closing argument?

MS. DOAN:  Yes, Your Honor.

THE COURT:  But it will not need to be sealed for
either Mr. Stevenson's or Mr. Burman's; is that correct?

MR. STEVENSON:  Your Honor, at about the halfway
point of my closing argument, I have a block of 10 minutes
to 15 minutes of sealed, and then we'll ask the Court to

1    unseal.

2              THE COURT:  How about you, Mr. Burman?

3              MR. BURMAN:  It's likely if he has 10 or 15

4    minutes, there'll be something that I'll need to respond to.

5              THE COURT:  All right.  Well, those of you in the

6    courtroom can readily tell there's going to be sealing and

7    unsealing going on during these closing arguments.

8              I expect you to move quickly and quietly if you're

9    leaving the courtroom.  And when I unseal it, I expect you

10   to return quickly and quietly.

11             All right.  Counsel, is there anything else before

12   I bring in the jury?

13             MR. BURMAN:  Nothing for Plaintiff, Your Honor.

14             MR. STEVENSON:  Nothing from Defendants.

15             THE COURT:  I have the parties' agreed instruction

16   with regard to the IEEE and the WiFi standard.  I will give

17   that as a separate instruction, and then I'll proceed to

18   give my final instructions to the jury.

19             All right.  Bring in the jury, please.

20             COURT SECURITY OFFICER:  All rise.

21             (Jury in.)

22             THE COURT:  Good morning, ladies and gentlemen.

23   Please be seated.

24             Ladies and gentlemen of the jury, I'd like to give

25   you the following instruction which you should know the

1    parties have seen and agreed to.

2         At the beginning of this trial, you were told that

3    HTC was asserting a claim that Ericsson breached its IEEE

4    commitments as to its WiFi standard essential patents.

5         That is no longer an issue in this case.  The only

6    contractual obligations in this case relate to the ETSI IPR

7    policy.

8         Now, with that instruction having been given, I'll

9    proceed at this time to give you my final instructions,

10   sometimes called the Court's charge to the jury.

11        Ladies and gentlemen of the jury, you have now

12   heard the evidence in this case, and I'm now going to

13   instruct you on the law that you must apply.

14        I want you to understand that when you retire to

15   deliberate, you are each going to have your own individual

16   printed copy of these instructions.

17        So I would hope you will pay attention and not feel

18   compelled to make notes unless you just want to.  But you

19   will have your own copy when you retire to the jury room.

20        It's your duty to follow the law as I give it to

21   you.  On the other hand, ladies and gentlemen, as I've said

22   previously, you, the jury, are the sole judges of the facts

23   in this case.

24        Do not consider any statement that I have made over

25   the course of the trial or make during these instructions as

1  an indication to you that I have any opinion about the facts

2  in this case.

3       You're about to hear closing arguments from the

4  attorneys.  Statements and arguments of the attorneys,

5  I remind you, are not evidence, and they are not

6  instructions on the law.  They're intended only to assist

7  the jury in understanding the evidence and the parties'

8  contentions.

9       A verdict form has been prepared for you, and you

10  will take this verdict form with you when you retire to the

11  jury room.  And when you have reached a unanimous decision

12  as to the verdict, you'll have your foreperson fill in the

13  blanks reflecting those unanimous decisions, sign the

14  verdict form on behalf of the jury, date it, and then advise

15  the Court Security Officer that you have reached a verdict.

16       Answer each question in the verdict form from the

17  facts as you find them to be.  Do not decide who you think

18  should win the case and then answer the questions to reach

19  that result.  Again, your answers and your verdict must be

20  unanimous.

21       Now, in determining whether any fact has been

22  proven in this case, you may, unless otherwise instructed,

23  consider the testimony of all the witnesses, regardless of

24  who may have called them.  And you may consider the effect

25  of all the exhibits received and admitted into evidence,

1   regardless of who may have produced them or presented them.

2         As I've told you before, you, the jury, are the

3   sole judges of the credibility and believability of each and

4   every witness and the weight and effect to be given to the

5   evidence in this case.

6         I've also told you previously that the attorneys in

7   this case are acting as advocates for their competing

8   parties and their completing claims, and they have a duty to

9   object when they believe evidence is being offered that

10   should not be admitted under the rules of the Court.

11         In the case where the Court has sustained an

12   objection to a question addressed to a witness, you must

13   disregard the question entirely, and you may draw no

14   inference from its wording or speculate about what the

15   witness would have said if I had allowed them to answer the

16   question.

17         On the other hand, if an objection was overruled by

18   the Court, then you must treat the question and the answer

19   just as if no objection had been made, like any other

20   question and answer.

21         Now, at various times over the course of the trial,

22   it's been necessary for the Court to discuss things and talk

23   with the attorneys here at the bench or outside of your

24   presence when you were in the jury room.  This happens

25   during trials because there are things that occur that do

1  not directly involve the jury.

2        You should not speculate, ladies and gentlemen,

3  about what was said during such discussions that took place

4  outside of your presence.

5        Now, there are two types of evidence that you may

6  consider in properly finding the truth as to the facts in

7  this case.

8        One is direct evidence, such as the testimony of an

9  eyewitness witness.

10       The other is indirect or circumstantial evidence --

11 that is, the proof of a chain of circumstances that

12 indicates the existence or the non-existence of certain

13 other facts.

14       As a general rule, you should know that the law

15 makes no distinction between direct and circumstantial

16 evidence but simply requires that you, the jury, find the

17 facts based on the evidence presented, both direct and

18 circumstantial.

19       Now, from time to time over the course of the

20 trial, you have seen documents that have redactions in them,

21 portions that have been blacked out.  Those documents were

22 redacted by agreement of the parties in this case, and you

23 are not to consider those redactions as an indication that a

24 party is trying to hide anything.  You should not guess or

25 speculate about what has been redacted in any document or

1    why the document has been redacted.

2         Now, the parties have stipulated or agreed to some

3    facts in the case, and when the lawyers for both sides

4    stipulate as to the existence of a fact, you must, unless

5    otherwise instructed, accept the stipulation as to the

6    evidence and regard the fact as proven.

7         Also, certain testimony has been presented to you

8    during this trial in the form of depositions.  A deposition

9    is a sworn recorded answers to questions asked to a witness

10   under oath in advance of a trial.  If a witness cannot be

11   present to testify in person, that witness's testimony may

12   be presented under oath in the form of a deposition.

13        As -- as I've told you earlier, the attorneys for

14   the case representing the parties have questioned these

15   deposition witnesses under oath in advance of the trial.

16        At those times, a court reporter was present, and

17   the questions asked and the answers given were recorded and

18   taken down.

19        Deposition testimony is entitled to the same

20   consideration by you as testimony of a witness who has

21   appeared in person and testified from the witness stand in

22   open court.

23        As a result, ladies and gentlemen, you should judge

24   the credibility and the importance of deposition testimony

25   to the best of your ability, just as if the witness had

1   personally testified from the witness stand in open court.

2          Now, at least one or more witnesses in this case

3   have testified both live before you and by deposition.  You

4   should not speculate or draw any inferences as to why a

5   witness testified both live and both by deposition in this

6   case.

7          Now, while you should consider only the evidence in

8   the case, ladies and gentlemen, you should understand that

9   you, the jury, are permitted to draw such reasonable

10  inferences from the testimony and the exhibits as you feel

11  are justified in the light of common experience.

12         Let me say it another way.  You, ladies and

13  gentlemen, may make deductions and you may reach conclusions

14  that reason and common sense lead you to draw from the facts

15  that have been established by the testimony and the evidence

16  in this case.

17         However, you should not base your decision on any

18  evidence not presented by the parties in open court during

19  the course of the trial, including your own personal

20  experiences.

21         Now, unless I instruct you otherwise, you may

22  properly determine the testimony of a single witness is

23  sufficient to prove any fact, even if a greater number of

24  witnesses may have testified to the contrary, if after

25  considering all the other evidence you believe that single

1    witness.

2         When knowledge of a technical subject may be

3    helpful to the jury, a person who has special training and

4    experience in that technical field, called an expert

5    witness, is permitted to state his or her opinions on those

6    technical matters to the jury.

7         However, ladies and gentlemen, you're not required

8    to accept those opinions.  As with any other witness, it's

9    solely up to you to decide who you believe, who you don't

10   believe, and whether or not you want to rely on that

11   testimony.

12        Now, over the course of the trial, certain exhibits

13   have been shown to you that were illustrations.  We call

14   these types of illustrations demonstrative exhibits.

15   Sometimes they're simply called demonstratives for short.

16        Demonstrative exhibits are a party's description,

17   picture, or model to describe something involved in the

18   trial.

19        If your recollection of the evidence differs from

20   the demonstratives, you should rely only on your own

21   recollection of the evidence.

22        Remember, demonstrative exhibits, which are

23   sometimes called jury aids, are not evidence themselves, but

24   a witness's testimony during which they use a demonstrative

25   is evidence.

1          Demonstrative evidence -- demonstrative exhibits

2    are not admitted exhibits in the trial, and they will not be

3    available to you to consider in the jury room while you

4    deliberate.

5          Now, in any legal action, facts must be proven by a

6    required amount of evidence known as the burden of proof.

7    The burden of proof in this case is on the Plaintiffs for

8    some issues, and it's on the Defendants for other issues.

9          There is one burden of proof that you will apply in

10   this case, and that burden of proof is the preponderance of

11   the evidence.

12         The Plaintiffs in this case, HTC Corporation and

13   HTC America, Inc., who I'll refer to simply as the

14   Plaintiffs, or collectively as HTC, they have the burden of

15   proving their breach of contract claims by a preponderance

16   of the evidence.

17         The Defendants in this case, Ericsson Inc. and its

18   Swedish parent company, Ericsson, who I'll collectively

19   refer to as the Defendants or as Ericsson, they have the

20   burden of proving their claim that HTC breached its

21   obligation to negotiate in good faith by a preponderance of

22   the evidence.

23         A preponderance of the evidence means the evidence

24   that persuades you, the jury, that a claim is more probably

25   true than not true.  This is sometimes talked about as being

1    the greater weight and degree of credible testimony.

2         Now, in determining whether any fact has been

3    proven by a preponderance of the evidence, you may, unless

4    instructed, consider the stipulations of the parties, the

5    testimony of all the witnesses, regardless of who may have

6    called them, and all the exhibits that have been admitted

7    into evidence during the trial regardless of who produced

8    them or introduced them.

9         Now, ladies and gentlemen, the fact that a person

10   brought a lawsuit creates no inference that the person is

11   entitled to a judgment.  Anyone may make a claim, and anyone

12   may file a lawsuit.

13        The act of making a claim in a lawsuit by itself

14   does not in any way tend to establish that claim, and it is

15   not evidence.  Therefore, you should draw no inference that

16   HTC is entitled to a judgment solely because it filed a

17   lawsuit against Ericsson.

18        Similarly, you should draw no inference that

19   Ericsson is entitled to a judgment solely because it has

20   filed counterclaims in this lawsuit against HTC.

21        Now, as I did at the beginning of the case, I'll

22   give you a summary of each side's contentions in the case,

23   and I'll then provide you with instructions as to what each

24   side must prove to win on each of their contentions.

25        As I've told you earlier, this is a breach of

contract case, and the contract at issue is for licenses to

patents related to cellular technologies.

HTC, the Plaintiffs, contend that Ericsson, the

Defendants, breached its contract -- Ericsson's contract

with the European Telecommunications Standards Institute,

known as ETSI.

Ericsson denies that its breached any contractual

obligations.

Ericsson also contends that HTC, the Plaintiffs,

have breached their obligation to negotiate with Ericsson in

good faith toward a license.

HTC denies that it has breached any obligation to

negotiate with Ericsson in good faith toward a license.

Now, generally, if a party asserts a breach of

contract claim, ordinarily, it seeks money damages as a

remedy for the alleged breach of contract.

In this case, however, neither HTC nor Ericsson are

seeking money damages from the other.

As a result, your job in this case is simply to

decide whether or not HTC or Ericsson have breached their

respective contractual obligations.

Now, before you can decide these issues, you'll

need to understand the terms of the contract at issue in

this case.

A contract is a legally enforceable promise or set

of promises.  When two individuals or entities enter into a contract that is intended to benefit a third party, the third party has standing to enforce the terms of the contract in the event that it is breached.

The contract at issue in this case is for a license to patents.

If an individual invents something, he or she may apply for a patent on that invention.  Patents are granted and denied in this country by the United States Patent and Trademark Office and in other -- and in other countries by their counterpart agencies.  Other countries, as I've said, have similar provisions and systems involving patents, and the patents in this case were obtained from various parts of the world.

Now, a patent gives the patentholder a right to prevent others from making, using, offering to sell, or selling the patented invention without the patentholder's permission.

A patentholder may also decide to give others permission to use its invention.  That permission is called a license.

The recipient of a license is called a licensee. Typically, in exchange for permission to use the invention in a patent, the licensee will pay the patentholder, who in that context is called the licensor, and those payments are

called royalties.

Ericsson entered into a contract with ETSI.  ETSI is a standards setting organization that is made up of member organizations.  ETSI adopted the 2G, 3G, and 4G, also called LTE, cellular communications standards that are at issue in this case.

Ericsson made a commitment to ETSI that it would license its patents essential to the 2G, 3G, and 4G/LTE standards on terms that are fair, reasonable, and non-discriminatory, otherwise known as FRAND terms.

Whether or not a license is FRAND will depend upon the totality of the particular facts and circumstances existing during the negotiations and leading up to the license.

Ladies and gentlemen, there is no fixed or required methodology for setting or calculating the terms of a FRAND license rate.

Now, although HTC is not a party to Ericsson's contract with ETSI, HTC is a third-party beneficiary to Ericsson's FRAND commitment to ETSI.

HTC contends that Ericsson breached its commitment to ETSI by failing to offer to HTC a license to Ericsson's 2G, 3G, and 4G/LTE standard essential patents on FRAND terms.

A duty of good faith exists with respect to

1   Ericsson's contractual obligations to ETSI.  A party to a

2   contract has a duty to perform in good faith the obligations

3   imposed by the contract.

4        Good faith performance of a contract requires being

5   faithful to the agreed common purpose of the contract and

6   performing consistently with the justified expectations of

7   the parties.

8        HTC contends that Ericsson breached its duty of

9   good faith in carrying out its contractual obligations to

10  ETSI.

11       Ericsson contends that HTC breached its duty of

12  good faith in negotiating with Ericsson for a license.

13       To find that HTC or Ericsson has breached a

14  contractual obligation, you must conclude that the party

15  bound by the contract did not fulfill its obligations under

16  the contract.

17       Now, with those instructions, ladies and gentlemen,

18  we are prepared to hear closing arguments from the attorneys

19  in the case.

20       The Plaintiff will present its first closing

21  argument at this time, and pursuant to the Plaintiffs'

22  earlier request, I'll order the courtroom sealed at this

23  time.

24       Those present, not subject to the protective order,

25  should excuse themselves until I unseal the courtroom.

 1              (Courtroom sealed.)

 2              (Sealed Portion No. 21 saved in a separate sealed

 3     transcript.)

 4              (Courtroom unsealed.)

 5              MS. DOAN:  Thank you.

 6              THE COURT:  Ms. Doan, I believe you left your

 7     glasses on the podium.

 8              MS. DOAN:  I could use those.

 9              THE COURT:  All right.  Mr. Stevenson, you may

10     present the Defendants' closing argument.

11              Would you like a warning on your time?

12              MR. STEVENSON:  Yes, I would, Your Honor.  Five

13     minutes, please.

14              THE COURT:  All right.  You may proceed.

15              MR. STEVENSON:  Thank you.  And may it please the

16     Court.

17              And ladies and gentlemen of the jury, good morning.

18              When I first addressed you in this case,

19     I suggested that this wasn't a case of discrimination, and

20     it wasn't a case of unfair treatment or unreasonable offers,

21     but rather it was a case of paying fair value for what you

22     use.  And I think the evidence has really borne that out in

23     this case.

24              HTC has challenged the market.  They've challenged

25     Ericsson's offer.  They've challenged our good faith.  But

 1   they haven't presented any evidence that the market got it

 2   wrong or that Ericsson was in bad faith or that our offer

 3   wasn't FRAND.

 4         And when HTC originally presented its 10-cent

 5   offer, I -- I looked for a way to -- to convey to you how

 6   Ericsson felt about that, why we reacted.  And the reaction

 7   actually came from the witness stand when Ms. Woodin had

 8   Dr. Parkvall on the stand.

 9         We brought you Dr. Parkvall as our first witness,

10   because we felt you needed to meet the person who is the

11   heart and sole of Ericsson.  It's an innovative company.

12   That's its culture.  It's been its culture for a century.

13         And when he was on the stand, at the very end of

14   his testimony, the following exchange took place.

15         Will you go to the next slide, Mr. Moreno?

16         Did you hear, I think, Mr. Perryman or Dr. Perryman

17   say that the value of all cellular, 2G, 3G, 4G, is between

18   19 cents and $1.22?

19         And Dr. Perryman answered:  Yeah, I heard that, and

20   it almost makes me upset, I must say.

21         How does that make you feel?

22         I mean, I spent 20 years of my career working on

23   cellular system, and I'm not the only one.  Thousands of

24   colleagues in Ericsson and other companies that go to these

25   meetings and spend a lot of effort enhancing these systems,

1  providing high data rates, et cetera, and I definitely think

2  it's worth more than a dollar.

3       And you could tell how he felt about HTC's

4  suggestion that all his work and the work of all the

5  colleagues that he has, his friends in the industry at the

6  standards meetings is worth 20 cents, a dollar.  And that

7  the offer from HTC didn't really respect all that hard work.

8       That sums up, I think, more than words I could ever

9  say, how we feel about this case and what we think this case

10  is about.

11       Now, HTC didn't bring an innovator to trial.  And

12  that's because HTC bases its research and development on the

13  work of others.

14       And the great thing about FRAND is, what -- what

15  really makes the system work is FRAND permits companies who

16  want to get into the cell phone market to use the

17  innovations of others, companies like Ericsson, Texas

18  Instruments, Nokia, Qualcomm, who have research departments

19  and engineers and they contribute that to -- to the

20  standards.

21       And the only issue -- the only thing is it's not

22  free, and it's not pennies.  Pay fair value, and that's all

23  we ask is fair value.

24       You know, Ericsson spends over $3 billion a year on

25  research and development.  It has 23,000 engineers, cellular

engineers who work with Dr. Parkvall.  That's more than the
average attendance at a major league baseball game.  Imagine
this stadium filled with cellular engineers, and that's just
Ericsson's contribution.

        And what do these people turn out?  What do these
engineers contribute?  These, ladies and gentlemen, are
Ericsson's standard essential patents, 195.  And these are
just one patent representative each of a family, okay?
195 representative patents.  Each one stands for about 15
worldwide.  If I put all the patents Ericsson has been
awarded for 4G -- this is just 4G -- in these boxes, there
would be 15 of them.

        But they're not just paper, okay?  Each patent has
a story, and it -- an inventor, somebody who is proud of his
work, who has had a eureka moment, who has worked long
nights.

        And these inventions deal with all aspects of your
cell phone, how it communicates, carrier aggregation,
advanced antenna, sleep mode, security, data transmission.
They make your cell phone work.  They make it more secure.
They make it faster.  They make it more efficient.  And it's
worth more than 10 cents.

        Now, HTC suggests that, well, these patents are
practiced by a single chip on a phone, and the industrywide
royalty -- you know, what everybody should split up is a

1    small portion of the profit margin of a chip.

2           But on the witness stand, HTC's expert,

3    Dr. Perryman, backed off his opinions.  And he said this is

4    just one way of many of looking at things.  And Ms. Doan

5    didn't really even mention this theory in her closing

6    argument.

7           But I want to address it very briefly because this

8    is the -- the rationale that underlied HTC's negotiating

9    position, that Ericsson just fundamentally didn't agree

10   with.  And the fundamental disagreement is that the cost of

11   stamping a chip by a chip company bears no relationship to

12   the value of the intellectual property that's encoded on the

13   chip.

14          Just like when you buy a computer program on a

15   CD-ROM, the cost of burning that CD-ROM, a few cents, bears

16   no relationship to the intellectual property, the program

17   that's encoded on it.

18          And when you buy a book, the cost of the print and

19   the paper and the binding bears no relationship to the value

20   of the story that's in the book.

21          Here, Dr. Perryman urged us repeatedly, look at the

22   market, look at the market.  I agree, let's look at the

23   market.  That's why we showed you these examples of an iPod

24   versus an iPhone, a $350.00 difference in value attributable

25   only to cellular.

1          And the HTC Nexus 9 which has $120.00 difference in

2     value solely due to cellular.

3          But common sense.  What would your phone be like,

4     what would it be worth if you didn't have cellular?  And

5     what would you pay to add it?

6          Now, HTC's theory was based on the fundamental

7     misconception that all of Ericsson's patents are practiced

8     on a chip and they're not the patent claims, which

9     Ericsson -- which Ericsson showed you and HTC never talked

10    about, are all directed to mobile terminals, mobile devices,

11    that sort of thing.

12         But the cell phone industry has also rejected this

13    model.  Companies who negotiate with Ericsson, some of the

14    most sophisticated companies in the world who have their own

15    patent portfolios, and they come armed for -- for hard

16    negotiations.  None of them advanced this theory and

17    obtained license agreements based on the cost of a chip.

18         So you saw documents about attack on FRAND.  Yes,

19    this is the attack on FRAND, and it is utterly and

20    completely misplaced.

21         Now, realizing, I think, the weakness in this

22    theory, HTC has pivoted in this case, and now, they want to

23    talk more about discrimination.  They want to look at other

24    offers.  And if you -- their theory is if you don't agree

25    with our licensing model or based on the chip cost, find

1    that there was a breach of FRAND based on discrimination.

2    And that's based on arguments that HTC's lawyers came up

3    with after they got discovery in this case.

4        But the charge of discrimination is wrong also.

5    And to address that, we brought Ms. Christina Petersson to

6    speak to you.  Her job is to make sure that Ericsson is fair

7    in its -- in its business dealings, and she obviously takes

8    her job very seriously.  And I believe she sincerely

9    believes that Ericsson has done nothing wrong in its

10   negotiations.

11       Now, there's been a lot of discussion about what

12   this FRAND contract requires, and I want to turn to that

13   briefly.

14       We rely primarily on the actual ETSI documents, the

15   Court's instruction, and the testimony of Dr. Huber who

16   participated in the drafting of the policy.  And replete

17   throughout this policy are statements about balance,

18   adequate and fair reward to patent owners, no preference for

19   specific licensing model.

20       But in addition, we brought you the testimony of

21   one of the people who actually was involved in the drafting.

22   And this was a contract.  And once the contract was drafted

23   in 1994, you don't change the terms.  And what Ericsson

24   signed onto was a contract where ETSI -- and we asked him:

25   Has ETSI ever had a most favored licensing requirement of

```
 1   any kind in the IPR policy that ETSI put into effect?

 2           No, it hasn't.

 3           But what you'll see now when we talk about the

 4   other agreements that Ericsson has entered into is that

 5   that's what HTC is asking for, a most favored licensee,

 6   which was never ever part of the contract.

 7           At this point, Your Honor, I must ask the Court to

 8   seal the courtroom.

 9           THE COURT:  All right.  I'll order the courtroom

10   sealed at this time.

11           If you're present and not subject to the protective

12   order in this case, you should exit and remain outside until

13   the courtroom is unsealed.

14           (Courtroom sealed.)

15           (Sealed Portion No. 22 saved in a separate sealed

16   transcript.)

17           (Courtroom unsealed.)

18           THE COURT:  You're free to continue, counsel.

19           MR. STEVENSON:  I'd like to now turn to another

20   piece of evidence we saw, and that is pool.  And this is

21   public information.

22           Again, if you're in the market and you want to know

23   what the market says, and HTC is part of the market, in

24   addition to knowing its own deals with other patentholders,

25   it can turn to the pool rates.  In fact, their expert,
```

1     Dr. Van Uden, looked at the pool rates, put them in a report

2     that he delivered to HTC during negotiations.

3           Now, the pool rate he looked at was Via.  And

4     that's DX-343.  And Via, who Dr. Lynde testified --

5     testified has a somewhat weaker patent portfolio for

6     4G than Ericsson, charges $2.55 a unit for companies with

7     about two million in sales.

8           And this is important for a couple of reasons.  The

9     first reason it's important is it shows you, again,

10     Ericsson's rate is pretty comparable to what's being charged

11     by others in the market, and this is public.  It's been out

12     there for a long time.  There's no evidence that anybody's

13     ever challenged this for -- for not being FRAND or -- I

14     mean, it's out an there understood public data point for

15     everybody, okay?  That's Point No. 1.

16           Point No. 2 is it embeds a volume discount,

17     obviously.  And, again, that's normal because these

18     negotiations take a lot of time and effort.  And if Ericsson

19     can go to a company like Samsung and license

20     330 million units in one deal, as opposed to going to a

21     company that sells one million units and cutting 330 deals

22     to reach the same volume -- I mean, imagine that savings and

23     transaction cost.  And that's what drives a lot of these

24     volume discounts.

25           Now, you know, HTC now wants to claim, well, maybe

1   those are discriminatory, but they're not.

2          In fact, HTC asked Ericsson in the mid-2000s for a

3   volume discount in negotiations.  And HTC actually had

4   agreements with volume discounts with Motorola and

5   Alcatel-Lucent.

6          But this is a situation I think now where because

7   of HTC's slighted sales, you know, they don't qualify for

8   the volume discount anymore.  And, now, they're saying in

9   court, well, if we can't get it, it must be discriminatory,

10  vote against Ericsson.

11         I'm going to talk -- I want to talk now a little

12  bit about the relationship between HTC and Ericsson, but

13  before I do, I want to summarize.

14         Based on the evidence you've seen on the

15  comparables, all the market evidence, I think it's clear

16  that Ericsson was offering HTC a fair, reasonable, and

17  non-discriminatory royalty rate.  You know, we didn't single

18  them out for unfair treatment.  We gave them rates in

19  accordance with their industry peers.

20         If you look at the prior deal HTC had with

21  Ericsson -- in the negotiations, we offered them yet again

22  the same rate as a renewal.  I mean, that's the essence of

23  good faith.

24         And -- and these other companies that HTC points

25  to, and then they unpack or extrapolate the numbers and say,

well, this is different, this is less, this is less, all
that math is just we think fundamentally wrong.  And they
also failed to take into account the other factors that
drive these deals like the geography, et cetera.

So there's no singling out for unfair treatment
here, there just isn't.  Ericsson sincerely wants to reach a
deal with HTC.  And as you'll see, was trying to continue to
negotiate, trying to continue to offer reformulated
proposals to HTC when they surprised us by suing us.

And that's what I want to turn to next.  Now, what
matters in this case is the 2016 negotiations for the
renewal between Ericsson and HTC.  And those are
negotiations between Mr. Woo and Mr. Earle.

But as a bit of a tangent, HTC brought in a witness
from the past who had been involved in negotiations 10 years
ago with Ericsson, Ms. Grace Lei.  And I want to say just
one word about her.  She -- she took the stand.  She told
you she was unbiased.  She didn't work for the company
anymore and was going to give you objective testimony.

But what she didn't tell you which came out on
cross-examination was she had received a $15 million
investment in her start-up company from the chairwoman of
HTC.

I think you have every right to question her
credibility and her motive for coming to Texas to testify.

1   But that all deals with the past.

2           And, you know, in negotiations, sometimes there's

3   personalities, but in the past with HTC, deals got worked

4   out, and there was never litigation between these two

5   companies.  They worked out deals.

6           But, now, we get to 2016.  For this negotiation,

7   the renewal negotiation, to testify, we brought our lead

8   negotiator, Robert Earle.  And as you can tell, Mr. Earle is

9   a straight shooter.  He's a man of his word.  And I think

10  that came through very clearly in the testimony and

11  particularly in the cross-examination.

12          In many ways in this negotiation, Mr. Earle was in

13  a no-win situation because I think it's fair to say, and

14  I think you saw, that before they even started going down

15  the road with Ericsson, HTC was gearing up for litigation.

16          You may remember the testimony of Mr. Woo on this

17  point.  I was asking him:  Sir, did you or did you not

18  anticipate litigation with Ericsson in July of 2016?

19          That was a possibility.

20          That's before HTC had gotten any information from

21  Ericsson, the claim charts, the representative patent list,

22  the statistics on, you know, the numbers of patents in

23  different categories, all that information.  And, you know,

24  he put up that timeline that omitted all that from the

25  timeline.

1          And, in fact, on the claim charts -- you know,

2    Ericsson sent the claim charts, all of them to HTC, ready to

3    have technical negotiations.  And we played a deposition

4    near the end of our case -- or read it in, and their

5    technical negotiator admitted he never read the claim

6    charts.  He never even got them.

7          THE COURT:  Five minutes remaining.

8          MR. STEVENSON:  So the truth is, even after HTC

9    offered 10 cents a phone and how Ericsson felt about that

10   offer, we continued to negotiate.  We absolutely continued

11   to negotiate.  And during this whole time, we were

12   absolutely prepared to grant a FRAND license.  But a FRAND

13   license isn't 10 cents.

14         And Ericsson in a lot of negotiations, people would

15   have walked away.  If you go to a car dealership and you

16   offer a thousand dollars for a $25,000.00 car, they're not

17   going to respond.

18         Ericsson stayed in the game.  Mr. Earle flew to

19   Taiwan to meet Mr. Woo for 12 minutes to find out why he was

20   offering 10 cents.  They went back a second time with two

21   negotiators for a longer meeting to find out why 10 cents.

22         And, of course, Ericsson heard the theory about the

23   portion of the profit margin of the chipset, and it

24   disagreed.  It absolutely disagreed.

25         But rather than give up, rather than walk away,

 1   Ericsson stayed in the game.  And the negotiators who met

 2   with HTC on March 31st and were asked by Mr. Woo to do

 3   homework, to give them a presentation justifying our offer,

 4   they flew back to Texas, began to work, began to reformulate

 5   an offer, maybe we can restructure the offer, maybe we can

 6   do a counter to keep things moving.  And less than five

 7   business days later, the lawsuit hit.

 8           And, of course, they stopped work, because now

 9   litigation has to -- litigation is pending, and information

10   gets exchanged through the litigation process.  And that's

11   unfortunate.

12           And HTC tried to suggest, well, we were afraid of

13   litigation.  They had almost three months remaining in the

14   grace period.  That's not -- that's not the excuse.

15           HTC tried to tell you, well, we couldn't accept the

16   offer because we didn't know what all of Ericsson's

17   comparable licenses were -- licenses were.  How could we

18   assure ourselves we were being treated fairly.

19           And, you know, Ericsson was willing to work with

20   them.  Mr. Earle proposed a mediator, a confidential

21   referee, which Ericsson has done before with companies when

22   they want this.  We'll give you the licenses,

23   Mr. Confidential Referee, and you tell both parties, is this

24   a fair offer.  And HTC never took us up on that.

25           Why wouldn't they take us up on that?  Well, I

think the answer is, they didn't want a fair deal.  They

didn't want a 2.50 deal.  Whether it was fair or not, they

didn't want that.  They were pursuing a lawsuit.  They were

papering the file.  And if they would have sent the -- the

licenses to a referee and the referee would have come back

and said, yeah, this is fair, they don't have any excuse

anymore not to sign.

Now, ladies and gentlemen, you're going to receive

from the Court a verdict form.  And I'd like to respectfully

suggest to you how Ericsson would ask you to respond to the

questions.

The first question you're going to get is:  Did HTC

prove by a preponderance of the evidence that Ericsson

breached its contractual obligation to HTC to offer a

license on fair, reasonable, and non-discriminatory terms?

And we suggest the answer to that is:  No.  We

didn't breach that obligation.

The second question you'll be asked is:  Did HTC

prove by a preponderance of the evidence that Ericsson

breached its duty to negotiate in good faith by carrying out

its contractual obligation to negotiate with HTC license to

Ericsson's essential patents.

And, again, we suggest the answer is:  No.  HTC

hasn't proved that.

We offered HTC rates that were consistent with

1   other licensees, consistent with what HTC has paid other

2   4G patent owners in the past, and consistent with our own

3   prior agreement.  And I think that's the essence of good

4   faith licensing.

5          And their model that they've abandoned now was what

6   drove their counter offer, and they didn't even talk about

7   it in their closing.

8          And the final question is our counterclaim:  Did

9   Ericsson prove that HTC failed to negotiate in good faith?

10  And on that counterclaim, ladies and gentlemen, we're not

11  seeking damages.  And you won't be asked to award damages.

12  We filed this counterclaim to clear our name.

13         And, finally, let me end on this.  You know, this

14  lawsuit is a serious allegation.  There's a lot of people

15  here that have been watching this.  It's of great importance

16  to our industry.  It's of great importance to the cellular

17  industry.  This lawsuit has challenged the integrity of

18  Ericsson.  It accuses us of discrimination.  And the

19  employees of Ericsson of proud of their technical

20  contributions and very rightfully so.  They didn't single

21  out HTC.  They didn't treat HTC unfairly.

22         Ladies and gentlemen, we thank you for your

23  service.

24         I mean, this has been a long week.  We appreciate

25  how seriously you've taken the evidence in this case and

1    your obligations as jurors.  Ericsson, our legal team, thank

2    you thank you very much for your service.  And we look

3    forward to receiving your verdict.  Thank you.

4         THE COURT:  All right.  Plaintiffs may now present

5    their final closing argument.

6         Mr. Burman, Plaintiffs have 10 minutes and 22

7    seconds remaining.  Would you like a warning on your time?

8         MR. BURMAN:  Yes, I would, at five minutes.

9         THE COURT:  Five minutes.  And if your argument

10   requires you to seal the courtroom, just let me know.

11        MR. BURMAN:  It does, Your Honor, and it will go so

12   fast that it's probably better to do it right now.

13        THE COURT:  All right.  Then at counsel's request,

14   I'll order the courtroom sealed and direct that those

15   present, not subject to the protective order in this case,

16   excuse themselves and remain outside until the Court unseals

17   the courtroom.

18            (Courtroom sealed.)

19            (Sealed Portion No. 23 saved in a separate sealed

20   transcript.)

21            (Courtroom unsealed.)

22        THE COURT:  For the record, the courtroom is

23   unsealed.

24            Ladies and gentlemen of the jury, I'd like to

25   provide you with a few final instructions before you begin

1  your deliberations.

2          You must perform your duty as jurors without bias

3  or prejudice as to any party.  The law does not permit you

4  to be controlled by sympathy, prejudice, or public opinion.

5          All parties in this case expect that you will

6  carefully and impartially contract all the evidence, follow

7  the law as I have given it to you, and reach a just verdict,

8  regardless of the consequences.

9          Answer each question in the verdict form from the

10  facts as you find them to be in this case, following the

11  instructions that the Court has included.  Again, do not

12  decide who you think should win and then answer the

13  questions accordingly.

14          I remind you, your answers and your verdict must be

15  unanimous.

16          You should consider and decide this case as a

17  dispute between persons of equal standing in the community,

18  equal worth, and holding the same or similar stations in

19  life.

20          This is true in cases between corporations,

21  partnerships, and individuals.  The law recognizes no

22  distinction between types of parties.  All corporations,

23  partnerships, and other business organizations stand equal

24  before the law, regardless of their size and regardless of

25  who owns them, and they are to be treated as equals.

1          Now, when you retire to the jury room to deliberate

2    on your verdict, you're each going to have a copy of these

3    final jury instructions that I'm giving you.

4          If during your deliberations you desire to review

5    any of the exhibits, not the demonstratives, but the

6    exhibits which the Court has admitted into evidence during

7    the trial, then you should advise me by a written note

8    signed by your foreperson and delivered to the Court

9    Security Officer.  I'll then send to you that exhibit or

10   those exhibits.

11         Once you retire, you should first select your

12   foreperson and then conduct your deliberations.

13         If you recess during your deliberations, follow all

14   the instructions that the Court has given you about your

15   conduct during the trial.

16         After you've reached a verdict, your foreperson is

17   to fill in the blanks in the verdict form reflecting your

18   unanimous answers to those questions.

19         Do not reveal your answers until such time as

20   you're discharged, unless otherwise directed by me.  And you

21   must never disclose to anyone, not even to me, your

22   numerical division on any question.

23         Any notes that you've taken over the course of the

24   trial, remember, they are aids to your memory only.  If your

25   memory should differ from your notes, then you should rely

1  on your memory and not your notes.

2      The notes are not evidence.  And a juror who has

3  not taken notes or who has taken very few notes should rely

4  on his or her own independent recollection of the evidence,

5  and you -- that juror should not be unduly influenced by the

6  notes of other jurors.  Notes are not entitled to any

7  greater weight than the recollection or impression of the

8  juror about the testimony.

9      If during your deliberations you want to

10  communicate with me at any time, then you should give a

11  message or a question written and signed by your foreperson

12  to the Court Security Officer who will bring it to me.

13      I will either then respond to you as promptly as

14  possible either in writing or by having you brought back

15  into the courtroom where I can address you orally.  I will

16  always first disclose to the attorneys in the case your

17  question and my response before I answer any question.

18      After you've reached a verdict and I have

19  discharged you from your obligations as jurors, you are not

20  required to talk with anyone about your service in this

21  case.

22      But by the same token, ladies and gentlemen, once I

23  have discharged you, you are free to talk with anyone about

24  your service in the case.  But that decision is totally and

25  100 percent yours and yours alone to make.

 1          I'm now going to hand eight copies of these final

 2     jury instructions and one clean copy of the verdict form to

 3     the Court Security Officer who will deliver them to you in

 4     the jury room.

 5          Members of the jury, you may now retire to the

 6     juror -- jury room to deliberate on your verdict.  We await

 7     your decision.

 8          COURT SECURITY OFFICER:  All rise.

 9          (Jury out.)

10          THE COURT:  Be seated, please, please.

11          Whose cell phone was that that sounded during my

12     final instructions to the jury?

13          DR. PERRYMAN:  It was mine, Your Honor.  I

14     apologize.

15          THE COURT:  I thought it was, Dr. Perryman.  Were

16     you present when I gave my instructions?

17          MR. PERRYMAN:  Yes, sir, I was.  I was under the

18     impression it was not on, and I apologize.

19          THE COURT:  I'd like to do something about it, but

20     I really don't know what to do.  Just don't ever let it

21     happen again in this court in front of me.

22          MR. PERRYMAN:  Yes, sir, Your Honor.  Thank you.

23          THE COURT:  Counsel, make sure if you do not elect

24     to wait for a verdict here in the courtroom, that you

25     furnish my staff with accurate cell phone numbers where you

1    can be reached if you are off premises.

2         You're free to wait here in the courtroom.  You're

3    also free to retire to whatever other location you have as

4    long as we can contact you and you can get here promptly in

5    the event of a note or in the event that a verdict is

6    returned.

7         Also, I'd like two representative cell phone

8    numbers from Plaintiffs and Defendants written on a single

9    piece of paper and delivered to me.  It's my practice, once

10   a verdict has been returned and accepted by the Court, to

11   visit with the jury in the jury room, thank them personally,

12   look them in the eye, and shake each hand.  I believe their

13   service warrants that in this case, regardless of what the

14   verdict is.

15        My practice is also to give them two representative

16   cell phone numbers from each side in the case and tell them

17   that if they want to talk about their service in the case,

18   they're free to call at their convenience on either or any

19   of those cell phone numbers.  And if they don't have a

20   desire to talk with the lawyers in the case, then they're

21   certainly not obligated to in any way.  That, I think, is a

22   better process than making you stake them out on the front

23   steps of the courthouse.

24        All right.  Pending either a note from the jury or

25   the return of a verdict, we stand in recess.

```
 1              COURT SECURITY OFFICER:  All rise.
 2              (Recess.)
 3              (Jury out.)
 4              COURT SECURITY OFFICER:  All rise.
 5              THE COURT:  Be seated, please.
 6              All right.  Counsel, you all got a phone call
 7      telling you we had received a note from the jury.  While we
 8      were assembling everybody, we got a second note from the
 9      jury.
10              I'll start with the first one.  I'll mark the first
11      one in the upper right-hand corner with the
12      numeral 1 to indicate it's the first jury note received, and
13      I'll hand it to the courtroom deputy.
14              And I have two copies for each side in the case.
15      If you'll approach the courtroom deputy, we have two copies
16      for Plaintiffs and two copies for Defendants.
17              And I'll go over the note with you, and then we'll
18      talk about it.
19              Can you please provide eight copies of the
20      questions so all of us can review them?
21              I take that that to mean the verdict form, and I've
22      already got eight copies of the verdict form printed.
23              Then below that, it says:  Can you please provide
24      the following exhibits.
25              And then you see the list there.
```

1           The first two do not have PX or DX in front of

2    them.  I want you to visit with each other and see if you

3    can agree without me going back to the jury for

4    clarification what they're asking for there.

5           And then the final component of this note is that

6    they want the correspond -- the email correspondence between

7    the parties from August of 2016 and the present or between

8    August 16 -- between August 2016 and the present.

9           And it's signed by Mr. Whiteland, who is Juror

10   No. 2.  He apparently is our foreperson.

11          Does everybody agree that eight copies of the

12   questions means the verdict form?

13          MR. STEVENSON:  I didn't hear your question, Your

14   Honor.

15          THE COURT:  Does everyone agree that the request

16   for eight copies, quote, of the questions means the verdict

17   form?

18          MR. STEVENSON:  I think that's right, yes.

19          THE COURT:  Does that sound right to you, Ms. Doan?

20          MS. DOAN:  Yes, Your Honor.

21          THE COURT:  Okay.  I've got those.

22          Why don't we go off the record and let you visit

23   about these specific exhibits?

24          We're off the record.

25          (Off the record discussion.)

1          THE COURT:  Let's go back on the record.

2          Let me tell you about Note No. 2, which I'm marking

3    in the same way for identification and handing to the

4    courtroom deputy.  I'll read it first, and then I have two

5    copies for each side.

6          It simply says:  Can we please have one more

7    whiteboard?

8          My thought would be that we take the easel with the

9    pad on it, tear off any sheets that have been written on,

10   and then send it back in with a magic marker.  That's close,

11   and that's handy.

12         Does anybody feel differently?

13         MR. STEVENSON:  Agreed.

14         MS. DOAN:  Agreed.

15         THE COURT:  All right.  Well, here are copies of

16   the note if you'd like them.  You can have them for your

17   files from the courtroom deputy.

18         Let me suggest, then, with regard to Note No. 1

19   that those paralegals from both sides of the case that

20   have been working with Ms. Lockhart come forward, and the

21   three -- one from each side and Ms. Lockhart, the three of

22   you collectively pull and identify these specific exhibits

23   that have been asked for so that we can get those correctly

24   pulled and in hand.

25         And then I will prepare a response that sends them

1    eight copies of the jury form, the easel and the board

2    that's on it, and these specific exhibits telling them

3    that we are working to pull together the email

4    correspondence, and we'll send that to them as soon as we

5    have it in hand.

6              Does that sound all right to both the parties?

7              MR. STEVENSON:  Agreed.

8              MS. DOAN:  It does.  I believe on all of the email

9    correspondence, not all of it is an exhibit.

10             THE COURT:  That's something you all are going to

11   have to work through once we get this sent back in.

12             All right.  I'll verify your agreement to my

13   written response before I send it in.  In the meantime,

14   let's work on pulling the exhibits.  Let's make sure that

15   the board is clean, and there's nothing on any of the

16   sheets.  We'd hate for them to see Mr. Baxter's spelling of

17   Verizon again.  And --

18             MR. BAXTER:  Thank you, Your Honor.

19             THE COURT:  And then I'll be back with a note to

20   read to make sure everybody agrees with it.

21             (Recess.)

22             THE COURT:  All right.  Let's go back on the

23   record.

24             Counsel, if you'll approach, I have an unsigned

25   copy of a response you can each have to look at.

```
 1              It reads as follows:  Response to Jury Note No. 1

 2   and 2.  Members of the jury:  In response to your Notes

 3   No. 1 and 2, I'm sending you the following:

 4              A.  Eight duplicate copies of the verdict form;

 5              B.  An easel with a blank pad and markers;

 6              C.  The following exhibits as requested.

 7              And then I've listed the specific exhibits as

 8   identified in the jury's note.

 9              Then I say:  Regarding the requested email

10   exhibits, we are gathering them now and will send them to

11   you shortly and when they are assembled.

12              Does either side have objection to this written

13   response being sent in with the pad, the markers, the

14   exhibits, and the copies of the verdict form?

15              Any objection from Plaintiffs?

16              MS. DOAN:  No objection.

17              MR. BURMAN:  No, Your Honor.

18              THE COURT:  From Defendants?

19              MR. STEVENSON:  No objection.

20              I guess one question, Judge, before -- on the

21   handwritten note, it looks like the fourth entry is PX-74,

22   though you have PX-78.

23              THE COURT:  Yes, you're right.  It's a typo.  Let's

24   check the rest of the numbers real quickly.

25              MR. STEVENSON:  I just did.  They look good.
```

1          MR. BURMAN:  They look fine.

2          THE COURT:  All right.  Let me re-print it with

3    that one correction, and with that correction, everybody is

4    good for me to send it in with these items, correct?

5          MR. STEVENSON:  Agreed.

6          MR. BURMAN:  Agreed.

7          THE COURT:  Okay.  We'll go off the record while I

8    make that correction, and then I'll send them in with the

9    Court Security Officer.

10          (Recess.)

11          THE COURT:  Let's go back to the record, please.

12          I'll hand the signed response to Jury Note 1 and 2

13    with eight copies of the verdict form, the requested

14    exhibits, and I'll hand those to the Court Security Officer,

15    as well as direct the Court Security Officer to deliver the

16    easel with blank pads and markers together with these items

17    to the jury.

18          And once the emails requested, both sides are

19    satisfied they have those in hand, let the Court know, and

20    I'll reconvene.

21          In the meantime, we stand in recess.

22          (Recess.)

23          THE COURT:  All right.  Let's go back on the

24    record.  Let me ask the parties through their counsel to

25    give me an update on the accumulation of the emails

1    requested by the jury in their first jury note.

2           Where are we?

3           MS. DOAN:  Your Honor, Jennifer Doan for the

4    Plaintiff.

5           We have two pieces of -- of email correspondence

6    between HTC and Ericsson -- Ericsson between August 2016 and

7    the present.  They are PX-0189 and PX-0250.

8           There is also a PX-0012, which is correspondence

9    between the parties dated June 14th, 2018.  It's a letter as

10   opposed to an email.  And we're fine with it going back, but

11   the Defendants have raised an objection because it's not

12   technically an email as requested.

13          THE COURT:  What's Defendants' position on this?

14          MR. MATHEWS:  Your Honor, PX-189 and PX-250 we

15   agree are email correspondence and should go back.

16          The other exhibit is a letter that was sent

17   concurrently with our FRAND contention deadline.  It is not

18   email correspondence between the parties, and we don't think

19   it falls within the scope of what the jury requested.

20          THE COURT:  Do you have the jury's original note,

21   Ms. Lockhart?  Can you pass it back to me?

22          Let me see this letter, please.  Somebody pass me

23   up a copy.

24          Is there anything substantively about the document

25   that you're opposed to, Mr. Mathews, or is it simply just a

1  very narrow reading of the jury's note with regard to the

2  difference between an ordinary letter and email?

3          MR. MATHEWS:  It's the latter, Your Honor.

4          Your Honor, if I may, I have one more thing.

5          THE COURT:  You may.

6          MR. MATHEWS:  I think the way we do interpret the

7  jury's note is they're referring to the email correspondence

8  that Ms. Doan showed on the ELMO during cross-examination of

9  Mr. Earle, and this particular letter falls far outside the

10 scope of that, as well.

11         THE COURT:  And I gather this letter, PX-12, was

12 published to the jury at some part in the -- some point in

13 the trial?

14         MS. DOAN:  It was, Your Honor.  It was covered with

15 the first witness.  It was covered also, I believe, with

16 Mr. Earle.  I'm not sure about that, but it has been before

17 the jury twice.

18         THE COURT:  Was it presented at or near the same

19 time as the emails were presented, or is it widely separate?

20         MS. DOAN:  No, it's -- it's the correspondence

21 chain, and that is the end of the chain.  That letter and

22 there's a letter two weeks later where they sent a letter

23 about a WiFi license.

24         MR. MATHEWS:  Yes, Your Honor, the letter is

25 14 months after the email correspondence between Mr. Woo and

1    Mr. Earle that Ms. Doan went through.

2           We don't think it's -- and I believe it was used

3    with Mr. Woo on the first day of trial, I believe.  I don't

4    believe that this particular exhibit was used with Mr. Earle

5    when Ms. Doan was going through all the email

6    correspondence.

7           THE COURT:  And am I correct there's a letter in

8    evidence two weeks after this one, another letter?

9           MS. DOAN:  I don't believe the one two weeks later

10   came into evidence, Your Honor.  It doesn't look like it's

11   in the box.  It was a totally separate -- different -- it's

12   one of the early attempts for a WiFi license that they were

13   giving us.

14          THE COURT:  And the emails that are exchanged that

15   are the other exhibits that you all have agreed on, those

16   were sent -- what's the time period covered by those emails?

17          MS. DOAN:  One -- one is maybe November/December of

18   2016, Your Honor.  That's Exhibit PX-0189, and then PX-250

19   looks like it is July 2017.  Hold on.  It may be June 2017,

20   June 2017, Your Honor.

21          THE COURT:  You don't disagree with that,

22   Mr. Mathews?

23          MR. MATHEWS:  I don't disagree with the dates.

24          THE COURT:  Well, I understand this is a

25   traditional letter and not an email.  It does fall within

1    the time range the jury's identified.  It is directly

2    between HTC and Ericsson.

3           And the request in the note says email

4    correspondence.  I'm going to take a broader rather than

5    narrower view, and I'll note Defendants' objection, but I'm

6    going to send the letter back together with the other

7    exhibits.

8           MR. MATHEWS:  Thank you, Your Honor.

9           THE COURT:  I can send the jury note saying, oh, by

10   the way, there's a letter, but they'd immediately asked to

11   see the letter anyway.

12          MR. MATHEWS:  I agree.

13          MS. DOAN:  Your Honor, one further matter, can --

14   does the Court wish to address the email correspondence that

15   we went through with Mr. Woo and Mr. Earle?  It's all

16   demonstrative.

17          THE COURT:  No.

18          MS. DOAN:  No, no, I mean, it's a new bag, but just

19   somehow advising them these are all the -- all the

20   correspondence so they don't think we're missing anything.

21          THE COURT:  I'm going to send them this, and if

22   they have questions, I'm sure they will send a further note.

23          MS. DOAN:  Yes, Your Honor.

24          THE COURT:  All right.  Ms. Lockhart, do you have

25   the other exhibits in hand?

1          Let's do this, counsel, following the earlier

2     practice of the Court, let's go off the record.

3          I will craft a written response to accompany these

4     exhibits to the jury.  We'll come back on the record when

5     I have it ready.  I'll review it with you and make sure you

6     have no objections.

7          We're off the record.

8          (Off the record discussion.)

9          THE COURT:  We're back on the record.

10         I have copies for each side which I'm going to send

11    in which will accompany these emails that

12    relate to the jury's idea.

13         This is supplemental response to Jury Note No. 1.

14         Members of the jury, in further response to your

15    Note No. 1 regarding email correspondence between HTC and

16    Ericsson, between August of 2016 and the present, I am

17    sending you the following:

18         PX-189, PX-250, and PX-12.

19         Is there any objection to this written response

20    accompanying those exhibits to be sent to the jury?

21         MS. DOAN:  No objection from the Plaintiff, Your

22    Honor.

23         MR. MATHEWS:  Not from Defendant, Your Honor.

24         Thank you.

25         THE COURT:  All right.  I'll hand the signed note

1   with the exhibits to the Court Security Officer and direct

2   that he deliver them to the jury.

3          I'll also hand an executed original of this note to

4   the courtroom deputy for the file.

5          And with that, pending either another note or the

6   return of a verdict, we stand in recess.

7          (Recess.)

8          COURT SECURITY OFFICER:  All rise.

9          THE COURT:  Be seated, please.

10          Counsel, the Court has received a third note from

11   the jury.  I'll read it, and then I will share with you what

12   I believe an appropriate written response will be, and then

13   I'll take your comments.

14          The notes reads as follows:  Your Honor, please

15   help us frame Question No. 1 in different terms.  We have

16   great difficulty getting the jurors to agree on what the

17   question is asking.  Thanks.

18          And there's a signature for Mark Whitehead, who

19   I assume is the foreperson.

20          Interestingly enough, the handwriting of the

21   question is very different than the signature of the

22   foreperson.

23          Here.  And I'll mark that as No. 3 for

24   identification and deliver it to the courtroom deputy.

25          Here, counsel, are copies of what I believe an

1    appropriate written response will be.  I have two for each

2    side.  If you'll approach and get them from the courtroom

3    deputy.

4         I'll read this proposed response into the record

5    and take your objections.

6         Members of the jury, the parties and the Court have

7    worked diligently in a manner that is consistent with the

8    law and the evidence.

9         The Court cannot reward, rephrase, or otherwise

10   restate any of the three questions in the verdict form.

11        You should carefully consider and weigh the

12   evidence presented during the trial, and from that determine

13   what you believe is the correct answer to Question No. 1, as

14   well as the other questions in the verdict form.

15        Are there comments, objections, or other input from

16   Plaintiff or Defendant on this response?

17        MR. STEVENSON:  No objection.

18        THE COURT:  Anything from Plaintiffs?

19        MR. BURMAN:  The only suggestion, Your Honor, would

20   be I guess we had it split between 2016 and 2018 yesterday,

21   whether that might help, but...

22        THE COURT:  And that was raised yesterday, and I'm

23   very well your fellow counsel is preserving that error or

24   what you think is an error, but I'm not going to submit the

25   ultimate questions in two different time frames to the jury.

```
 1            MR. BURMAN:  Understood, Your Honor.

 2            THE COURT:  I made that decision earlier, and I'm

 3    not going to change it now.

 4            MR. BURMAN:  Understood.  Otherwise, Your Honor,

 5    we're fine with that.

 6            THE COURT:  Having heard that I'm going to execute

 7    this written response.

 8            Ms. Lockhart, here's a signed copy for the Court's

 9    file.

10            COURTROOM DEPUTY:  Thank you.

11            THE COURT:  All right.  Counsel, pending another

12    note or a verdict, we stand in recess.

13            COURT SECURITY OFFICER:  All rise.

14            (Recess.)

15            COURT SECURITY OFFICER:  All rise.

16            THE COURT:  Be seated, please.

17            All right.  Counsel, we've received a fourth note

18    from the jury.  I've marked it as No. 4 for identification.

19    After I've read it, I will deliver the original to the

20    courtroom deputy.

21            Your Honor, we would like the email which compares

22    HTC counter proposal and Ericsson counter proposal which HTC

23    ultimately rescinded.

24            Signed by Mr. Whiteland as the foreperson.  Again,

25    the handwriting is not that of the foreperson.
```

1          I'll hand the original note to the courtroom

2     deputy.

3          I have a proposed written response.  If you want to

4     approach, I have copies for each side.  I'll read it into

5     the record, and then I'll take any feedback from the parties

6     regarding my proposed response.

7          Members of the jury, in response to

8     Jury Note No. 4, the Court has previously sent to you per

9     your request the email correspondence between HTC and

10    Ericsson from August 2016 through the present.

11         Any comparisons that you are asking for were

12    presented as demonstratives which are not evidence.

13         However, the sworn testimony of a witness using a

14    demonstrative is evidence.  You must rely upon your memory

15    of the evidence presented during the trial as the basis to

16    answer the questions in the verdict form.

17         Are there objections to that written response from

18    either party?

19         It seems to me that we've already sent them the

20    email correspondence that can cover any offers or counter

21    offers, and they must be thinking about a demonstrative

22    comparative chart.  That was the basis for my response.

23         MR. STEVENSON:  Your Honor, may we have a moment or

24    two to confer?

25              THE COURT:  Yes.

1          MR. STEVENSON:  We think we might be able to figure

2     out what it is.  But can we confer before responding?

3          THE COURT:  We'll go off the record, during which

4     time counsel can confer with their co-counsel.

5          We're off the record.

6          (Off the record discussion.)

7          THE COURT:  Let's go back on the record.

8          Let me hear responses from the parties with regard

9     to the jury's Note No. 4.

10          Mr. Stevenson?

11          MR. STEVENSON:  I believe after looking through the

12     exhibits, the DX-336 is the email chain they are interested

13     in, and I have no objection to it going back.

14          THE COURT:  DX what?

15          MR. STEVENSON:  336.

16          THE COURT:  Mr. Burman?

17          MR. BURMAN:  I'm confused, Your Honor.  I -- it

18     could be that one.  It seems to me -- I don't know why

19     they'd be looking at 2013.  I had thought that probably

20     between this and Question 3 that they were conflicted on

21     whether they had to find both 2016 and 2018 or whether they

22     could do either/or.  But now I don't know what -- why

23     they're --

24          THE COURT:  Well, let me ask this, do you object to

25     the Court sending back DX-336?

1          MR. BURMAN:  No, Your Honor.

2          THE COURT:  I'm either going to do that or tell

3    them I'm not sending you anything and just consider your

4    memory of the evidence.

5          So let me recompose a written response in light of

6    DX-336.  And I'll be back to present it to you for further

7    comment in just a minute.  But until then, we're off the

8    record.

9          COURT SECURITY OFFICER: All rise.

10         (Recess.)

11         THE COURT:  All right.  Counsel, let's go back on

12   the record.

13         If you want to approach, I have two copies of a

14   proposed written response in light of the last discussion

15   about Jury Note No. 4.  I'll read it and then get your

16   reactions to this proposed response.

17         In response -- members of the jury, in response to

18   Jury Note No. 4, the Court has previously sent to you for

19   your request the email correspondence between HTC and

20   Ericsson from August of 2016 through the present.  However,

21   with the agreement of the parties, I am sending you DX-336,

22   which will hopefully be helpful to you.

23         As I have previously instructed, you must rely on

24   your memory of the evidence presented during the trial as

25   the basis to answer the questions in the verdict form.

```
 1              Any objection from Plaintiff or Defendant?

 2              MR. STEVENSON:  No objection.

 3              MR. BURMAN:  No objection, Your Honor.

 4              THE COURT:  All right.  Then I'll sign the written

 5    response to Jury Note No. 4, I'll put with it DX-336, and

 6    I'll deliver those to the Court Security Officer with

 7    instructions to deliver the same to the jury.

 8              I'll also sign a duplicate of that written response

 9    and deliver it to the court security -- the courtroom

10    deputy.

11              Now, pending another note or a verdict, we stand in

12    recess.

13              COURT SECURITY OFFICER:  All rise.

14              (Recess.)

15              COURT SECURITY OFFICER:  All rise.

16              THE COURT:  Be seated, please.

17              All right.  Counsel, I've received the following

18    from the jury.

19              Your Honor, we have reached a verdict.

20              It is signed by Mr. Mark Whiteland, who I'm

21    assuming is the foreperson of our jury.  I'll hand the note

22    to the courtroom deputy.

23              And I'll direct the Court Security Officer to bring

24    in the jury.

25              COURT SECURITY OFFICER:  All rise.
```

1          (Jury in.)

2          THE COURT:  Please be seated.

3          Mr. Whiteland, I understand that you're the

4   foreperson of the jury; is that correct?

5          THE FOREPERSON:  Yes, sir.

6          THE COURT:  Has the jury reached a verdict?

7          THE FOREPERSON:  Yes, sir, we have.

8          THE COURT:  Would you hand the signed and dated

9   verdict form to the Court Security Officer who will bring it

10  to me?

11         All right.  Ladies and gentlemen of the jury, I'm

12  going to announce the verdict into the record at this time,

13  and I'm going to ask each member of the jury to listen very

14  carefully as I do this, because after I have announced the

15  verdict, I'm going to poll the jury to make sure on the

16  record that this is the unanimous verdict of all eight

17  members of the jury.

18         Turning to the verdict form and turning to Page 2

19  where Question 1 is located:  Did HTC prove by a

20  preponderance of the evidence that Ericsson breached its

21  contractual obligation to offer HTC a license on FRAND terms

22  to Ericsson's cellular standard essential patents?

23         The answer is no.

24         Question 2 found on Page 3 of the verdict form:

25  Did HTC prove by a preponderance of the evidence that

1   Ericsson breached its duty of good faith in carrying out its

2   contractual obligation to negotiate with HTC for a license

3   to Ericsson's cellular standard essential patents?

4          The answer is yes.

5          Turning to Page 4 of the verdict form wherein

6   Question 3 is located:  Did Ericsson prove by a

7   preponderance of the evidence that HTC breached its duty to

8   negotiate with Ericsson in good faith for license for

9   Ericsson's cellular standard essential patents?

10          The answer is yes.

11          The fifth and final page of the verdict form is

12   dated with today's date, and it's signed

13   by Mr. Mark Whiteland as foreperson of the jury.

14          Ladies and gentlemen, let me poll you at this time

15   to make sure that this verdict is the unanimous decision of

16   the entire jury.

17          If this is your verdict as I have read it into the

18   record, would you please stand at this time?

19          (Jury polled.)

20          Thank you, please be seated.

21          Let the record reflect that all eight members of

22   the jury immediately stood in response to the Court's

23   question to poll the jury, and the Court finds that this is

24   the unanimous verdict of all eight members of the jury.

25          The Court accepts the jury's verdict, and I'll

1  deliver the original verdict form as executed to the

2  courtroom deputy.

3       Ladies and gentlemen, this now completes the trial

4  of this case.  I've instructed you over and over again

5  throughout the trial not to communicate with anyone about

6  your service as jurors or about anything that happens during

7  the trial.  I'm now releasing you from that instruction, as

8  well as the other instructions and obligations that you've

9  had as jurors.

10      You're free to talk about your service with anyone

11  you'd like to.  You're also free not to talk with anyone

12  about your service as jurors if -- if you wouldn't like to.

13      The practice in this district has long been that

14  the lawyers who compose the trial teams are not at liberty

15  to contact you or to initiate a conversation with you about

16  your service.

17      However, if you would like to communicate or talk

18  with any of them about your service, you certainly are free

19  to do that, and they certainly would be interested in any

20  feedback that you would feel inclined to give them.

21      You will probably see one or more of them as you

22  pass outside the jury room through the building to your

23  respective cars when you leave, and if you want to talk to

24  them, stop and talk.  I guarantee you, if you initiate a

25  conversation, they'll want to talk to you.  If you don't,

1    don't initiate a conversation.  They will not initiate one

2    with you, and you're free just to walk to your vehicles or

3    go wherever you'd like to go.

4          I do have a copy of two cell phone numbers, two

5    from the Plaintiffs' lawyers and two from the Defendants'

6    lawyers, and I'm going to give those to you in a few

7    minutes.  If tomorrow, next week, or whenever you would feel

8    inclined to reach out to either or all of them, you'll have

9    cell phone numbers where you can call or text or do that.

10   If you don't want to, you're under no obligation to, and you

11   certainly don't have to.

12         But I want you to understand, any communications

13   about your service as jurors is up to you, and it's up to

14   you alone.  It is strictly your prerogative.

15         Also, ladies and gentlemen, on behalf of the Court,

16   I want to -- I want to sincerely thank you for your service

17   in this case.  This has -- this has been a difficult trial.

18   And there are no easy cases that get to a jury trial in a

19   United States District Court.  And I can -- I can rarely, if

20   ever, remember a jury more attentive, more focused, and more

21   engaged than you've been throughout this week.  And I want

22   to thank you for that.

23         Also, ladies and gentlemen, I told you when you

24   were empaneled as the jury that you were doing very real and

25   important public service by making the sacrifice to serve as

1    jurors.  And I believe that with my whole heart.

2          It is my practice since I have been a federal judge

3    when a verdict is returned in a case like this to ask the

4    jury for a favor, and I'm going to ask you for a favor now.

5          We are through with this trial, and you are

6    released as jurors, but before you leave the building, I'm

7    going to ask as a personal favor that you go back in the

8    jury room for just a couple minutes.

9          I'd like the honor to come into the jury room and

10   shake each one of your hands and look each one of you in the

11   eye and tell you personally how much the Court as an

12   institution and me individually appreciate what you've done

13   and the service you've rendered as being jurors.

14         I won't keep you, it won't take long, but if you

15   would afforded me that personal privilege, I would

16   appreciate it very much.  I think what you've done warrants

17   that is kind of particularized thanks and appreciation, and

18   it would be an honor for me to have a --just a moment of

19   your time to do that before you leave.

20         Counsel, that completes the trial of this case.

21         Ladies and gentlemen of the jury, if you'll meet me

22   in the jury room, I'll be there in just a minute.

23         Counsel, you're excused.

24         COURT SECURITY OFFICER:  All rise.

25         (Court adjourned.)

1                          CERTIFICATION

2           I HEREBY CERTIFY that the foregoing is a true and

3    correct transcript from the stenographic notes of the

4    proceedings in the above-entitled matter to the best of my

5    ability.

6

7

8     /S/ Shelly Holmes                    2/15/19
     SHELLY HOLMES, CSR, TCRR             Date
9    OFFICIAL REPORTER
     State of Texas No.: 7804
10   Expiration Date: 12/31/20

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25