**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| HTC CORPORATION, HTC AMERICA INC, § § § *Plaintiffs*, § § § **v.** § § TELEFONAKTIEBOLAGET LM § ERICSSON, ERICSSON INC, § § § *Defendants*. § | CIVIL ACTION NO.  6:18-CV-00243-JRG |

**MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiffs HTC Corporation and HTC America Inc. (collectively, "HTC") filed suit against Defendants Telefonaktiebolaget LM Ericsson and Ericsson, Inc. (collectively, "Ericsson"), alleging that Ericsson breached its contractual obligation to the European Telecommunications Standards Institute ("ETSI") by failing to offer HTC a license to Ericsson's standard-essential patents ("SEPs") on terms and conditions that are fair, reasonable, and non-discriminatory ("FRAND").  (Dkt. No. 135.)  Ericsson denied the allegation and asserted a counterclaim seeking a declaratory judgment that it has complied with its FRAND assurance to HTC.  (Dkt. No. 156 ¶¶ 44–49.)  The case was tried to a jury, (Dkt. Nos. 450–51, 453–54, 460), and after deliberating, the jury found that HTC had not shown by a preponderance of the evidence that Ericsson breached its contractual obligation to ETSI.  (Dkt. No. 457.)  In light of the jury's verdict and pursuant to its Counterclaim I, Ericsson moves for a declaratory judgment that it has complied with its FRAND assurance to HTC.  (Dkt. No. 494.)

Pursuant to Federal Rule of Civil Procedure 52(a), the following constitutes the Court's Findings of Fact and Conclusions of Law as to Counterclaim I.  The Court finds that Ericsson has

1

complied with its FRAND assurance to HTC and enters a declaration as set forth and particularly described herein.

## I. FINDINGS OF FACT ("FF")

### A. The Parties

**[FF1]** Plaintiffs HTC Corporation ("HTC Corp.") and HTC America, Inc. ("HTC America") design, manufacture, and sell mobile devices. (Dkt. No. 135 ¶ 12.) HTC Corp. is a Taiwanese company with headquarters in Taiwan. (*Id.* ¶ 10.) HTC America is a wholly-owned subsidiary of HTC Corp. and has its principal place of business in Washington state. (*Id.* ¶¶ 10–11.) HTC America sells HTC Corp.'s mobile devices in the United States, which implement the second generation (2G), third generation (3G), and fourth generation (4G) Mobile Cellular and Wireless Standards. (*Id.* ¶¶ 10–11, 51–52.)

**[FF2]** Defendants Telefonaktiebolaget LM Ericsson ("TLM Ericsson") and Ericsson, Inc. make and sell "base stations and supporting software and services compliant with the 2G, 3G, and 4G standards in the United States." (Dkt. No. 156 ¶ 16.) TLM Ericsson is a Swedish corporation with its principal place of business in Sweden, and its wholly-owned subsidiary, Ericsson, Inc., is a Delaware corporation with headquarters in Texas. (*Id.* ¶¶ 14–15.)

### B. The FRAND Commitment

**[FF3]** Cellular networks and mobile devices implement technological standards that allow devices made by different manufacturers to connect with one another in a network environment. Kristen Osengo, *Reasons for and Brief History of Standardization in* PATENTS AND STANDARDS: PRACTICE, POLICY, AND ENFORCEMENT 1-2, 1-13 (Michael L. Drapkin et al. eds., *Bloomberg Law* Book Division, 2018). ETSI is the standards-setting organization ("SSO") that enacts standards related to mobile cellular technologies, including the 2G, 3G, and 4G standards.

*Id.* at 1-3, 2-41. "Once a standard is adopted, participants begin to make investments tied to the implementation of the standard, such as creating compliant parts, building compliant cellular towers and even designing devices around particular capabilities." (Dkt. No. 135 ¶ 133.)

**[FF4]** Patented technology that is "essential" to implement a standard is called a standard essential patent ("SEP"). *See ETSI Rules of Procedure*, Annex 6, Clause 15. A patent is "essential" if it is not technically possible to practice the standard without infringing the patent. *Id.* ETSI has an intellectual property rights ("IPR") policy that "define[s] contractual terms for disclosure and licensing of patents that are essential for standard implementation." Richard Taffet & Phil Harris, *Standards and Intellectual Property Rights Policies in* PATENTS AND STANDARDS: PRACTICE, POLICY, AND ENFORCEMENT at 4-2 (Michael L. Drapkin et al. eds., *Bloomberg Law Book Division*, 2018). If a member of ETSI owns a SEP, it is required to declare (1) the patent as essential to the standard and (2) whether it agrees to license its patent to companies that practice the standard on specific terms. *Id.* "A commitment to license creates a contract between the SEP owner and the SSO" in which "[s]tandards implementers are third-party beneficiaries under such contracts." *Id.* at 4-10. If a member of ETSI submits a licensing declaration pursuant to Clause 6.1 of the ETSI IPR policy, it agrees that it is "prepared to grant" licenses to its SEPs on "terms and conditions" that are "fair, reasonable, and non-discriminatory ('FRAND')." *See ETSI Rules of Procedure*, Annex 6, Clause 6.1.

### C. The Parties' Licensing Dispute

**[FF5]** Ericsson, as a member of ETSI, owns patents declared essential to the 2G, 3G, and 4G standards, and has made a commitment to offer its SEPs on FRAND terms and conditions. (Dkt. No. 156 ¶¶ 2, 51, 110.) HTC's mobile devices implement the 2G, 3G, and 4G standards. (Dkt. No. 135 ¶¶ 48–50.)

**[FF6]** HTC is also a member of ETSI, owns patents declared essential to the 2G, 3G, and 4G standards, and has made a commitment to offer its SEPs on FRAND terms and conditions. (Dkt. No. 156 ¶ 6.) Ericsson's base stations and support software implement the 2G, 3G, and 4G standards. (*Id.* ¶ 16.)

**[FF7]** Ericsson and HTC entered into three cross-license agreements for each party's respective SEPs in 2003, 2008, and 2014. (Dkt. Nos. 132–2, 132–3, 132–4.) The 2014 cross-license agreement expired on December 31, 2016, and the parties began negotiating to renew the license in 2016. (Dkt. No. 496 at 3.) The parties reached an impasse, and on April 6, 2017, HTC filed the instant suit, alleging that Ericsson breached its contractual obligation to ETSI by failing to offer HTC a FRAND license. (Dkt. No. 1.) HTC subsequently amended its complaint, adding additional causes of action, which the Court referred to arbitration. (Dkt. Nos. 135, 220.) On September 7, 2018, Ericsson denied HTC's allegations and asserted a counterclaim for a declaratory judgment that it complied with its FRAND assurance to HTC. (Dkt. No. 156 ¶¶ 44–49.)

**[FF8]** During the parties' renewal negotiations, Ericsson made two offers to HTC for a license to Ericsson's cellular SEPs. In December 2016, Ericsson offered HTC a license at a rate of $2.50 per 4G device. (PX–0189.) HTC rejected Ericsson's offer and counter-offered a rate of $0.10 per 4G device. (Dkt. No. 467 at 36:7–42:14; 42:16–18 (2/11/2019 Sealed Trial Tr. (afternoon session)).) On June 15, 2018, during the pendency of this case, Ericsson offered HTC a license at a rate of 1% of the net selling price of HTC's 4G device with a $1 floor and a $4 cap. (PX–0012.) HTC rejected Ericsson's second offer. (Dkt. No. 493 at 1.) Ericsson represents that both offers remain open to HTC. (*Id.*)

**[FF9]** HTC and Ericsson have each agreed to be bound by the Court's adjudication of the FRAND claims at issue. (*See* Dkt. No. 1 ¶¶ 10, 13; *id.* at 36; Dkt. No. 156 at 40–41.)

## II. CONCLUSIONS OF LAW ("CL")

### A. Subject Matter Jurisdiction

**[CL1]** District courts are vested with discretion as to whether to entertain a request for declaratory judgement. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289 (1995). A court has subject matter jurisdiction to issue a declaratory judgment if "there is a justiciable case or controversy." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126–27 (2007); *see also* 28 U.S.C. § 2201. A justiciable controversy exists when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 127. A court cannot issue a declaratory judgment that would be merely advisory. *Id.*

**[CL2]** The Court finds that Ericsson's request for a judicial declaration is well-founded. Despite the jury's verdict that HTC failed to carry its burden on its breach of FRAND claim, the parties continue to dispute whether Ericsson's offers to HTC complied with the FRAND obligation. Issuing a judicial declaration regarding the same will resolve a major issue in the parties' licensing dispute. *See Harris v. United States Fid. & Guar. Co.*, 569 F.2d 850, 852 (5th Cir. 1978) ("It is well settled that a district court may render a declaratory judgment though that judgment will not settle all the issues of the entire controversy. The controversy settled by the declaratory judgment need only be an autonomous dispute."). The Court therefore finds that a sufficient case or controversy exists between the parties and that a declaratory judgment is appropriate in this case.

## B. Standard Applied in the Context of a Jury Trial

**[CL3]** Where there are overlapping factual issues that relate to a claim tried to a jury and a claim to be resolved by the court, the court must conduct the jury proceeding first and defer to the jury's finding on any overlapping factual issues. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510 (1959); *Thermo-Stitch, Inc. v. Chemi-Cord Processing Corp.*, 294 F.2d 486, 490 (5th Cir. 1961) ("[W]here the presence of legal and equitable causes in the same case requires the selection between a jury and a non-jury determination of certain common issues. . . a jury determines issues pertinent to an equitable cause without interruption or prejudice to the proceeding; the court decides whether equitable relief is called for on the basis of the jury's findings of fact."); *accord Sanders v. City of Newport*, 657 F.3d 772, 783 (9th Cir. 2011) ("[W]here legal claims tried by the jury and equitable claims tried by the court are based on the same set of facts, the Seventh Amendment requires the trial judge to follow the jury's implicit and explicit factual determinations.").

**[CL4]** In this case, there is substantial overlap between the factual issues related to HTC's breach of FRAND claim that was tried to the jury, and Ericsson's request for a declaratory judgment that it has not breached its FRAND obligation. As such, the Court follows the standard set forth in *Beacon* and finds, as detailed below, that there was substantial evidence to support the jury's verdict that HTC had failed to show that Ericsson breached its FRAND commitment. The Court further observes that, even in the absence of this verdict, the Court's review of the evidence submitted would have led it to conclude that Ericsson complied with its FRAND assurance to HTC, for the reason expressed below.

### C. The ETSI IPR Policy

**[CL5]** The ETSI IPR policy requests that owners of essential patents declare the terms upon which they will license their patents to implementers of the standard. *See ETSI Rules of Procedure*, Annex 6, Clause 6.1. Ericsson has committed to ETSI that it is prepared to grant licenses on FRAND terms and conditions. (Dkt. No. 156 ¶¶ 2, 51, 110.) HTC, as an implementer of the cellular standards, is a third-party beneficiary of Ericsson's contract with ETSI and is entitled to enforce that contract. (Dkt. No. 135 ¶¶ 48–50.)

**[CL6]** The ETSI IPR policy is governed by French law and states that "[a]ny right granted to, and any obligation imposed on, a member which derives from French law and which are not already contained in the national or supranational law applicable to that member is to be understood as being of solely a contractual nature." *ETSI Rules of Procedure*, Annex 6, Clause 12.

**[CL7]** Prior to trial, the Court considered, as a legal matter of contractual interpretation under Federal Rule of Civil Procedure 44.1, whether the ETSI IPR policy required royalties to be calculated based on the smallest salable patent practicing unit ("SSPPU"). (Dkt. No. 376.) The Court found that "as a matter of French law, the FRAND commitment embodied in the ETSI IPR policy does not require a FRAND license to be based on the SSPPU." (*Id.* at 12.) Specifically, the Court held that "the ETSI IPR policy neither requires nor precludes a license with a royalty based on the SSPPU. Rather, whether a license meets the requirements of FRAND will depend on the particular facts of the case, as there is no prescribed methodology for calculating a FRAND license." (*Id.*)

**[CL8]** In addition, as explained in its concurrently filed Memorandum Opinion and Final Judgment, the Court finds that, as a matter of French law, to satisfy the FRAND obligation,

7

a SEP-owner must either (1) offer a FRAND license, or (2) negotiate in good faith towards a FRAND license. In this case, the jury found that Ericsson failed to negotiate in good faith in carrying out its contractual obligations to ETSI. (Dkt. No. 457 at 2.) This finding, alone, does not preclude a declaration that Ericsson has complied with its FRAND obligation by offering a FRAND license.

### D. The Smallest Saleable Patent Practicing Unit

**[CL9]** HTC's primary assertion in support of its breach of FRAND claim is that Ericsson should have based its royalty calculation on the smallest saleable patent practicing unit, or SSPPU, contained in a cellular device, which HTC submitted was the baseband processor. HTC argued that, due to the proliferation of features in modern smartphones that are not related to cellular connectivity and as a matter of economics, the royalty should be based on the baseband processor in order to apportion out the value of features not related to the cellular connection. (Dkt. No. 467 at 51:21–54:10 (2/11/2019 Sealed Trial Tr. (afternoon session)).)

**[CL10]** At trial, HTC asserted that a portion of the profit margin of a baseband processor was the cash flow available for payment of license fees, and that, as a result, the aggregate royalty for all essential patent holders should be between $0.19 and $1.22 per 4G device. (Dkt. No. 472 at 77:19–23 (2/13/2019 Trial Tr. (morning session)).) Based on HTC's calculations of Ericsson's share of patents compared to the industry, HTC claimed that under its SSPPU approach, Ericsson's royalty should be between $0.01 and $0.08 per 4G device. (Dkt. No. 478 at 159:14–19 (2/14/2019 Trial Tr. (afternoon session)).)

**[CL11]** At trial, Ericsson presented testimony from Mr. Robert Mills, an economist, who testified that the profit margin that a component supplier makes is not necessarily reflective of the value of the intellectual property embodied in that component, especially in a situation like

8

the one presented here where the component supplier does not pay royalties for that intellectual property. (Dkt. No. 479 at 37:20–38:14 (2/14/2019 Sealed Trial Tr. (afternoon session)).) In the multi-supplier baseband processor market, some manufacturers sell their chips at a net loss, but that does not mean the intellectual property contained in the components has no value or negative value. (Dkt. No. 466 at 125:7–20 (2/11/2019 Trial Tr. (afternoon session)).)

**[CL12]** The Court finds that the market-based evidence offered by Ericsson at trial shows that customers value cellular technology more highly than HTC suggests. For instance, Ericsson introduced evidence that consumers are willing to pay more than $100 to add cellular functionality to regular Wi-Fi enabled tablets. As an example, the price for an HTC Nexus 9 with 4G cellular connectivity was $120 higher than a Nexus 9 with only Wi-Fi connectivity. (Dkt. No. 478 at 88:14–21 (2/14/2019 Trial Tr. (afternoon session)).) The market-based evidence of the value of cellular belies HTC's suggestion that the entire value of all cellular technology is between $0.19 and $1.22 and demonstrates the reasonableness of Ericsson's proposed royalty rates of $2.50 or 1% with a $1 floor and a $4 cap per 4G device.

**[CL13]** Further, it was contested whether the baseband processor is even the smallest saleable patent practicing unit. At trial, HTC presented expert testimony from Dr. Andrew Wolfe that the baseband processor in HTC's phones "is the only component that embodies Ericsson's standard essential patents related to 4G." (Dkt. No. 468 at 108:3–9 (2/12/2019 Trial Tr. (morning session)).) On cross-examination, however, Dr. Wolfe conceded that not all of Ericsson's patents could be infringed by a baseband processor alone and that they require "other components." (Dkt. No. 470 at 21:11–19 (2/12/2019 Trial Tr. (afternoon session)).)

**[CL14]** Ericsson presented expert testimony from Mr. Claude Royer, who testified that Ericsson's patents require additional components, including antennas, RF switches, baseband

9

filters, low-noise amplifiers, and duplexers. (Dkt. No. 474 at 186:5–187:18 (2/13/2019 Trial Tr. (afternoon session)).) Mr. Royer presented six exemplary Ericsson patent claims to the jury that each apply to a "mobile terminal" as opposed to a baseband processor. (*Id.* at 190:17–191:4.) Mr. Royer proceeded to identify and describe additional examples of Ericsson patent claims that read on components other than a baseband processor. Mr. Royer testified that the "vast majority" of Ericsson's patents read on a "mobile terminal" or "user equipment," which necessarily encompasses components other than a baseband processor. (*Id.* at 190–193.) Out of the hundreds of claims that Mr. Royer investigated, he identified only three that claim only a baseband processor. (*Id.* at 192:25–193:2.)

**[CL15]** Finally, industry licensing practice is instructive in this regard. The Court views the rates contained in licenses as highly probative, given the sophistication of the market and the amount of resources and time that the industry devotes to negotiations. Ericsson established, and HTC's own experts conceded, that there are no examples in the industry of licenses that have been negotiated based on the profit margin, or even the cost, of a baseband processor. HTC's license expert, Dr. Perryman, was unable to identify a single industry license based on the profit margin of a chip. (Dkt. No. 478 at 170:1–4 (2/14/2019 Trial Tr. (afternoon session)).) *See also* Kurt Kjelland, et al., *FRAND Licensing of Standard-Essential Patents in*, PATENTS AND STANDARDS PRACTICE: POLICY, AND ENFORCEMENT at 11–8 (Michael L. Drapkin et al. eds., *Bloomberg Law Book Division*, 2018) (identifying common practice of licensing at the handset level).

**[CL16]** The Court finds that, given the magnitude in difference between Ericsson's offers to HTC and HTC's assertion that Ericsson's royalty should be no more than $0.08 per device, the only reasonable inference to draw from the jury's verdict is that the jury found HTC's SSPPU-based arguments unpersuasive. The Court further finds that there was sufficient and

credible evidence for the jury to reject HTC's approach. Specifically, Ericsson presented credible evidence (i) that the profit margin, or even the cost, of the baseband processor is not reflective of the value conferred by Ericsson's cellular essential patents, (ii) that Ericsson's patents are not limited in claim scope to a baseband processor, and as a result, even if one were to indulge HTC's approach, the baseband processor is not the proper SSPPU, and (iii) that the market evidence, in the form of comparable licenses, has failed to embrace HTC's preferred SSPPU methodology.

### E. Comparable Licenses

[CL17]   In addition to the SSPPU analysis, the parties presented evidence of comparable licenses.  Ericsson argued that comparable licenses offered the best evidence of the value of its cellular SEPs.  (Dkt. No. 478 at 17:20–18:13 (2/14/2019 Trial Tr. (afternoon session)).)  HTC argued that the comparable licenses demonstrated that Ericsson's offer to HTC were discriminatory.  (Dkt. No. 474 at 4–62 (2/13/2019 Trial Tr. (afternoon session)).) The Court finds that the comparable licenses provide the best market-based evidence of the value of Ericsson's SEPs and that Ericsson's reliance on comparable licenses is a reliable method of establishing fair and reasonable royalty rates that is consistent with its FRAND commitment.

[CL18]   The jury received evidence and heard testimony regarding Ericsson's SEP licenses with Apple, BLU, Coolpad, Doro, Fujitsu, Huawei, Kyocera, LG, Panasonic, Samsung, Sharp, Sony, and ZTE.  (DX–2; Dkt. No. 478 at 76–95 (2/14/2019 Trial Tr. (afternoon session)); Dkt. No. 479 at 5–40 (2/14/2019 Sealed Trial Tr. (afternoon session)).)  For instance, the following table summarizes licenses with ███████████████████████████████ each of which have licenses with running royalty rate terms that are either similar or substantially similar to the rates Ericsson offered to HTC:

| **Comparable Ericsson LTE Licenses** | | | | |
|---|---|---|---|---|
| Entity | Effective Date | Exp. Date | Payment Terms | Other Terms |
| ■ | | | 1.0% of the net selling price of 4G handsets with a floor of $1.00 per handset and a cap of $4.00 per handset. | License to ■ SEPs. |
| | | | 1.5% of the net selling price for 4G handsets sold in China with a floor of $1.30 per handset and a cap of $2.00 per handset. 2.4% - 3.0% of the net selling price for 4G multimode handsets sold outside of China with a floor of $2.00 per handset and cap of $5.00 per handset. | License to ■ SEPs |
| | | | ■, which converted to approximately $2.20 per 4G handset | License to ■ SEPs |
| | | | $2.30 per 4G handset | License to ■ SEPs |
| | | | 1.3% of the net selling price of each 4G handset with a floor of $1.25 per handset and a cap of $4.00 per handset. | License to ■ SEPs |
| | | | 1.4% of the net selling price of each 4G handset with a floor of $1.50 per handset and a cap of $4.50 per handset. | License to ■ SEPs |
| | | | Payments of $39 million per quarter from 2018-19Q1. Then, additional payments of 1.0% of the net selling price of each 4G handset with a floor of $1.25 per handset and a cap of $4.00 per handset. | License to ■ SEPs |

**[CL19]** The jury also received evidence and heard testimony regarding the earlier SEP licenses between Ericsson and HTC as well as offers Ericsson made to TCL and ZTE. (*Id.*) For example, the jury heard testimony that HTC valued their Ericsson-HTC 2014 license to be worth ■ per applicable handset device and that HTC's experts valued the Ericsson-HTC 2014 license to be worth between ■ and ■ per applicable handset device. (Dkt. No. 479 at 6:20–8:13

(2/14/2019 Sealed Trial Tr. (afternoon session)).) Further, the jury received evidence and heard testimony regarding HTC's SEP licenses with Apple, Nokia, and NTT DoCoMo. (DX–2; Dkt. No. 478 at 76–95 (2/14/2019 Trial Tr. (afternoon session)); Dkt. No. 479 at 5–40 (2/14/2019 Sealed Trial Tr. (afternoon session)).)

[CL20] At trial, Ericsson provided testimony that its offers to HTC were consistent with the vast majority of the aforementioned licenses. (Dkt. No. 478 at 76–95 (2/14/2019 Trial Tr. (afternoon session)); Dkt. No. 479 at 5–40 (2/14/2019 Sealed Trial Tr. (afternoon session)).)

[CL21] At trial, HTC argued that Ericsson's offers were discriminatory in view of Ericsson's existing licenses with Apple, Samsung, and Huawei; the expired license with LG from 2014; and license offers that Ericsson made to TCL and ZTE. (Dkt. No. 474 at 4–62 (2/13/2019 Trial Tr. (afternoon session)).)

[CL22] Ericsson presented testimony to rebut HTC's arguments. In particular, Ericsson presented evidence and testimony to the jury that many of the licenses identified by HTC as demonstrating discrimination were with large manufacturers that included payments of ▬▬▬ ▬▬▬ dollars in up-front royalties, which are particularly different than running royalty rate agreements. (Dkt. No. 476 at 22:1–23:1 (2/14/2019 Trial Tr. (morning session)); DX–2.) Ericsson also presented testimony that several of the companies identified by HTC had a different geographical scope of sales, and therefore not similarly situated to HTC. (Dkt. No. 477 at 17:4–19:4; 38:16–41:3 (2/14/2019 Sealed Trial Tr. (morning session)).)

[CL23] In many instances, Ericsson and HTC presented competing interpretations of various licenses. Many comparable licenses included terms, such as cross-license provisions and lump sum payments, that required economic analysis to translate into an effective, one-way royalty rate. (Dkt. No. 478 at 16:7–17:25 (2/14/2019 Trial. Tr. (afternoon session)).) For example, nearly

all of Ericsson's licenses are structured as cross-licenses, under which Ericsson obtains a license to implement its licensee's patents in its own cellular infrastructure products. (Dkt. No. 476 at 20:3–21:25 (2/14/2019 Trial Tr. (morning session)).) The cross-license represents, in many cases, significant value to Ericsson, the amount of which depends on the strength of the patents for which Ericsson receives a cross-license. (*Id.*) In contrast, HTC's essential 4G patents are entitled to little cross-licensing value, because HTC granted a royalty free license to Ericsson before trial. (Dkt. No. 335 at 5.)

**[CL24]** The Court finds that in light of the comparable license evidence presented at trial, the only reasonable inference that can be drawn from the verdict is that the jury necessarily rejected HTC's arguments that Ericsson's offers resulted in discrimination against HTC.

**[CL25]** The Court, likewise, is of the view and concludes that based on the whole of Ericsson's submitted comparable licenses, both of Ericsson's offers to HTC—$2.50 or 1% with a $1 floor and a $4 cap per 4G device—were fair, reasonable, and non-discriminatory.

## III. CONCLUSION

After considering the parties' arguments, the trial record, and the relevant authorities, the Court finds, in its discretion, that issuing a declaratory judgment as to Ericsson's Counterclaim I is appropriate. Thus, consistent with the jury's verdict rendered on February 15, 2019, and the Court's finding and conclusions set forth above, the Court hereby **DECLARES** that, in its dealings with HTC as presented in this case, Ericsson complied with its FRAND assurance to HTC, as set forth in its IPR licensing declarations to ETSI and the ETSI IPR policy.

**So ORDERED and SIGNED this 23rd day of May, 2019.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE